## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| JAGGER HARDY, ANDREW MONTEMAYOR, NANCY PICKETT, GERI DARROW, and LUIS VITERI, individually and on behalf of all others similarly situated, | Civil Action No. _<br><br>CLASS ACTION COMPLAINT<br><br>JURY TRIAL DEMANDED |
| Plaintiffs, | |
| v. | |
| VOLKSWAGEN GROUP OF AMERICA, INC. d/b/a AUDI OF AMERICA, INC., VOLKSWAGEN AG, and AUDI AG, | |
| Defendants. | |

1.     Plaintiffs Jagger Hardy, Andrew Montemayor, Nancy Pickett, Geri Darrow, and Luis Viteri ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Volkswagen Group of America, Inc. doing business as Audi of America, Inc. ("VWGoA"), Volkswagen AG ("VWAG"), and Audi AG  (together, "Defendants" or "VW").  Plaintiffs allege the following based on personal knowledge as to their own acts and based upon the investigation conducted by their counsel, including analysis of publicly available information, as to all other allegations:

## INTRODUCTION

2.      Plaintiffs bring this consumer class action lawsuit because Defendants manufactured, marketed, distributed, and sold 2015-2020 Volkswagen Golf, 2015-2020 Audi A3, and 2022-2024 Volkswagen Taos vehicles (the "Class Vehicles") without disclosing the existence of a troubling defect that jeopardizes the safety of Class Vehicle drivers, passengers, and other drivers and pedestrians.

3.      Beginning in 2015 if not before, Defendants knew that the Class Vehicles contain one or more defects in the suction jet pump and/or fuel tank components.  Discovery will show that the Class Vehicles' fuel tank, suction jet pump, and related components are defective in that they are designed, manufactured, and/or installed in a manner that causes fuel leaks, premature fuel nozzle shutoffs, fuel spillbacks, and/or gas odor inside the vehicle ("Suction Pump Defect" or "Defect"). The Defect increases the risk of a fire, interferes with the ability of the engine to receive fuel, and, discovery will show, likely is the result of: 1) inadequately designed, manufactured, or installed seals in the suction jet pump; 2) the use of inadequate materials in the suction jet pump which begin to degrade from the moment the pump is exposed to fuel; 3) improper design of the gas tank and/or the suction jet pump; and/or 4) improper design of the fuel system itself.

4.      Defendants failed to disclose these material facts and safety concerns to purchasers and lessees of the Class Vehicles.

5.      Defendants sold the Class Vehicles with a 3-year/36,000-mile or a 4-year/50,000-mile New Vehicle Limited Warranty that purports to cover the fuel tank, suction jet pump, and related components. However, owners and lessees have

2

often complained that their Fuel Tank components requiring repair or replacement are refused a sufficient repair, even when within the warranty period. This is evidenced through Class Member complaints to the National Highway Traffic Safety Administration ("NHTSA"), which demonstrate that Defendants' authorized dealerships are ineffectively repairing Fuel Tank components or refusing repair.

6.    The Suction Pump Defect is inherent in each Class Vehicle and was present at the time of sale or lease.

7.    Accordingly, discovery will show that, since the beginning of 2015, Defendants have known that the Class Vehicles' fuel tank, suction jet pump, and related components were defective and would need frequent repair, prematurely fail, require frequent replacement, including replacements just outside of warranty, that the replacement fuel tank, suction jet pump, and related components installed would be equally as defective as the originals, and that the fuel tank, suction jet pump, and related components would cause the symptoms of the Suction Pump Defect described above. Nevertheless, Defendants continued to equip the Class Vehicles with defective fuel tanks, suction jet pumps, and related components. Moreover, Defendants not only refused to disclose the alleged Suction Pump Defect to consumers, they also actively concealed, and continue to conceal, their knowledge concerning the Suction Pump Defect.

8.    Defendants undertook affirmative measures to conceal fuel tank, suction jet pump, and related components' failures and other malfunctions through, *inter alia*, Technical Service Bulletins ("TSBs") issued to authorized repair facilities only and not provided to owners or lessees.

9.     Defendants had superior and/or exclusive knowledge of material facts regarding the Suction Pump Defect due to their pre-production testing, design failure mode analysis, aggregate part sales, consumer complaints about the Defect to Defendants' dealers – who are its agents for vehicle repairs-- customer complaints made directly to VW, dealer audits, aggregate warranty information, consumer complaints to, and resulting notice from, NHTSA, early consumer complaints on websites and internet forums, dealership repair orders, among other internal sources of information about the problem.

10.     The Defect is material because, *inter alia,* it poses a safety concern, as attested by Class Members in complaints to NHTSA, and to other online forums.

11.     Defendants' failure to disclose the Defect has caused Plaintiffs and putative class members to lose the use of their vehicles and/or incur costly repairs that have conferred an unjust substantial benefit upon Defendants. Discovery will show that, in an effort to conceal the Defect, Defendants have instructed dealers to tell consumers their vehicles are "operating normally" or "operating as intended" when they are not, or to give excuses for sub-par performance such as excessive fuel consumption and fuel spillbacks. This is a common practice in the automotive industry. By denying the existence of a defect, manufacturers can play on the consumers' lack of technical expertise and avoid implementing potentially costly fixes for years, or at least until the vehicles are out of warranty. When remedial measures are taken, they are often through the issuance of service bulletins provided to dealers only that are narrowly crafted and underinclusive, as occurred here and set forth *infra.*

12.     Had Defendants disclosed the Defect, Plaintiffs and Class Members would not have purchased or leased the Class Vehicles, would have paid less for them, or would have required Defendants to replace, or pay for the replacement of, the defective fuel tanks, suction jet pumps, and related components with non-defective versions before their warranty periods expired.

### JURISDICTION AND VENUE

13.     This Court has original diversity jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2) ("CAFA"). Plaintiffs and many members of the Class are citizens of states different from Defendants' home state, the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and there are more than 100 members in the proposed Class and Classes.

14.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over Defendants because VWGoA has its principal place of business and headquarters in this District; VW conducts substantial business in this District through VWGoA; and upon information and belief, significant conduct involving Defendants giving rise to the Complaint took place in this District.

15.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District, VWGoA has its principal place of business and regularly conducts business in this District, and VWGoA is a resident of this District under 28 U.S.C. § 1391(c)(2) and subject to personal jurisdiction in this District.

## PARTIES

### __Plaintiff Jagger Hardy__

16.     Plaintiff Jagger Hardy is a Florida citizen who resides in Florida.

17.     In or around October 2014, Plaintiff Hardy purchased a new 2015 Volkswagen GTI SE from Napleton's Volkswagen of Sanford, an authorized Volkswagen dealership located in Sanford, Florida.

18.     Plaintiff Hardy purchased his vehicle primarily for personal, family, or household use.

19.     Safety and reliability were important factors in Plaintiff Hardy's decision to purchase his vehicle. Plaintiff Hardy looked up Consumer Reports safety ratings for the vehicle and recalls generally seeing television commercials and a magazine advertisement which described the vehicle, prior to his purchase. Plaintiff Hardy also reviewed the vehicle's Monroney window sticker and warranty documents, discussed the vehicle with an authorized VW dealership representative, and test drove the vehicle. Relying on these representations and advertisements, Plaintiff Hardy believed that the Volkswagen GTI SE would be a safe and reliable vehicle. When Plaintiff Hardy purchased his vehicle, he was unaware that the vehicle contained the Suction Pump Defect.

20.     Plaintiff Hardy was never informed by Defendants that his vehicle suffered from the Defect. Defendants' omissions were material to Plaintiff Hardy. Had Defendants disclosed their knowledge of the Defect before he purchased his vehicle, Plaintiff Hardy would have seen and been aware of the disclosures.

Furthermore, had he known of the Defect, Plaintiff Hardy would not have purchased his vehicle, or would have paid less for it.

21.    In or around 2017, Plaintiff Hardy began to experience the Defect. Specifically, Plaintiff Hardy smelled gas from inside the cabin of the vehicle. Then, in or about 2022, gas spilled out of the tank of Plaintiff Hardy's vehicle while at a gas station. He had the car towed to Napleton's Volkswagen of Sanford that night, where they replaced the fuel pump under warranty. About six months later, Plaintiff Hardy began smelling gas from inside the cabin again. Plaintiff Hardy's vehicle was no longer under warranty at this time. An authorized Volkswagen dealership at that time told Plaintiff Hardy that there was nothing wrong with the vehicle and did not give him a diagnosis.

22.    Unsurprisingly, Plaintiff Hardy continues to smell gas fumes in the cabin of the vehicle after filling up his tank. Napleton's Volkswagen of Sanford recently told him "maybe don't drive the car anymore" and told him there is no remedy for the issue. To date, Plaintiff Hardy's vehicle has not been permanently repaired and continues to be defective.

23.    As a result of the Suction Pump Defect, Plaintiff Hardy has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Hardy will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although he would like to do so.

24.    At all times, Plaintiff Hardy, like all class members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**Plaintiff Andrew Montemayor**

25.    Plaintiff Andrew Montemayor is a Hawaii citizen who resides in Hawaii.

26.    In or around July 2016, Plaintiff Montemayor purchased a new 2016 Audi A3 from Audi Honolulu, an authorized Audi dealership located in Honolulu, Hawaii.

27.    Plaintiff Montemayor purchased his vehicle primarily for personal, family, or household use.

28.    Safety and reliability were important factors in Plaintiff Montemayor's decision to purchase his vehicle. Plaintiff Montemayor researched the vehicle before purchase, reviewed the vehicle's Monroney window sticker and handbook, and discussed the vehicle with an authorized VW dealership representative. Relying on these representations, Plaintiff Montemayor believed that the Audi A3 would be a safe and reliable vehicle. When Plaintiff Montemayor purchased his vehicle, he was unaware that the vehicle contained the Suction Pump Defect.

29.    Plaintiff Montemayor was never informed by Defendants that his vehicle suffered from the Defect. Defendants' omissions were material to Plaintiff Montemayor. Had Defendants disclosed their knowledge of the Defect before he purchased his vehicle, Plaintiff Montemayor would have seen and been aware of the disclosures. Furthermore, had he known of the Defect, Plaintiff Montemayor would not have purchased his vehicle, or would have paid less for it.

30.    In or about March 2024, Plaintiff Montemayor began to experience the Defect. Specifically, fuel started to flow back out when Plaintiff Montemayor

attempted to fill his fuel tank, and he could smell gas fumes inside the vehicle's cabin. He spoke with a representative at an Audi corporate office as well as with an authorized Audi dealership about the issues, and was told that there is no remedy and that they do not know when they will have one. Plaintiff Montemayor took the vehicle to an independent repair shop that specializes in VW and Audi vehicles, where his vehicle was diagnosed with a malfunctioning suction jet pump. The repair shop replaced the suction jet pump and performed EVAP repairs.

31.     In or around June 2024, Plaintiff Montemayor took his vehicle to Audi Honolulu to ensure Manufacturer Recall No. VW: 20UF/AUDI: 20YF, regarding the Defect, was performed. Plaintiff Montemayor was informed by the Audi dealer personnel that Audi currently has no remedy available pursuant to the recall and that Plaintiff would need to pay approximately $275 and leave his vehicle for multiple days for the Audi dealer to even perform an inspection. To date, Plaintiff Montemayor's vehicle has not been permanently repaired and continues to be defective.

32.     As a result of the Suction Pump Defect, Plaintiff Montemayor has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Montemayor will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although he would like to do so.

33.     At all times, Plaintiff Montemayor, like all class members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**Plaintiff Nancy Pickett**

34.     Plaintiff Nancy Pickett is a Missouri citizen who resides in Missouri.

35.     In or around January 2022, Plaintiff Pickett purchased a new 2022 Volkswagen Taos from Volkswagen of Lee's Summit, an authorized Volkswagen dealership located in Lee's Summit, Missouri.

36.     Plaintiff Pickett purchased her vehicle primarily for personal, family, or household use.

37.     Safety and reliability were important factors in Plaintiff Pickett's decision to purchase her vehicle. Plaintiff Pickett reviewed the vehicle's Monroney window sticker, and discussed the vehicle with an authorized VW dealership representative. Relying on these representations, Plaintiff Pickett believed that the Volkswagen Taos would be a safe and reliable vehicle. When Plaintiff Pickett purchased her vehicle, she was unaware that the vehicle contained the Suction Pump Defect.

38.     Plaintiff Pickett was never informed by Defendants that her vehicle suffered from the Defect. Defendants' omissions were material to Plaintiff Pickett. Had Defendants disclosed their knowledge of the Defect before he purchased her vehicle, Plaintiff Pickett would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Plaintiff Pickett would not have purchased her vehicle, or would have paid less for it.

39.     In or about April 2022, Plaintiff Pickett began to experience the Defect. Specifically, the vehicle's fuel gauge began to malfunction. Plaintiff Pickett took the vehicle to Volkswagen of Lee's Summit, an authorized Volkswagen dealership,

10

where she was told that there was a malfunction in the electric fuel pump. The in-tank fuel pump and other components were replaced. Then, in or around September 2023, the fuel gauge malfunctioned again, and the check engine light came on. Plaintiff Pickett took the vehicle to Volkswagen of Lee's Summit, where the fuel tank assembly and leak diagnosis pump were replaced.

40.     In or around November 2023, the vehicle started leaking fuel from the rear passenger side, stalled in the road and would not restart, and Plaintiff Pickett could smell gas heavily in the cabin. She took the vehicle to Volkswagen of Lee's Summit once again, where the fuel line, fuel tank, and other components were replaced. To date, Plaintiff Pickett's vehicle has not been permanently repaired and continues to be defective.

41.     As a result of the Suction Pump Defect, Plaintiff Pickett has lost confidence in the ability of her Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Pickett will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although she would like to do so.

42.     At all times, Plaintiff Pickett, like all class members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**Plaintiff Geri Darrow**

43.     Plaintiff Geri Darrow is a Florida citizen who resides in Florida.

44.     In or around January 2023, Plaintiff Darrow purchased a pre-owned 2019 Volkswagen GTI from Grossman Nissan, a dealership located in Old Saybrook, Connecticut.

45.    Plaintiff Darrow purchased her vehicle primarily for personal, family, or household use.

46.    Safety and reliability were important factors in Plaintiff Darrow's decision to purchase her vehicle. Plaintiff Darrow reviewed the vehicle's Carfax, viewed online and Television advertising for the vehicle, and test drove the vehicle. Relying on these representations, Plaintiff Darrow believed that the Volkswagen GTI would be a safe and reliable vehicle. When Plaintiff Darrow purchased her vehicle, she was unaware that the vehicle contained the Suction Pump Defect.

47.    Plaintiff Darrow was never informed by Defendants that her vehicle suffered from the Defect. Defendants' omissions were material to Plaintiff Darrow. Had Defendants disclosed their knowledge of the Defect before she purchased her vehicle, Plaintiff Darrow would have seen and been aware of the disclosures. Furthermore, had she known of the Defect, Plaintiff Darrow would not have purchased her vehicle, or would have paid less for it.

48.    In or around August 2023, Plaintiff Darrow began to experience the Defect. Specifically, Ms. Darrow noticed that the vehicle was consuming gasoline at a fast rate. She could also smell gas in and around the vehicle, and in the vehicle's oil. Ms. Darrow took the vehicle to Central Volkswagen of Plainfield, an authorized Volkswagen dealership located in Plainfield, Connecticut, to be inspected. The dealership replaced the water pump and thermostat. To date, Plaintiff Darrow's vehicle has not been permanently repaired and continues to be defective.

49.    As a result of the Suction Pump Defect, Plaintiff Darrow has lost confidence in the ability of her Class Vehicle to provide safe and reliable

transportation for ordinary and advertised purposes. Further, Plaintiff Darrow will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although she would like to do so.

50.     At all times, Plaintiff Darrow, like all class members, has driven her vehicle in a manner both foreseeable and in which it was intended to be used.

**Plaintiff Luis Viteri**

51.     Plaintiff Luis Viteri is a New Jersey citizen who resides in New Jersey.

52.     In or around November 2015, Plaintiff Viteri purchased a new 2015 Volkswagen Golf from Reydel Volkswagen of Linden, an authorized Volkswagen dealership located in Linden, New Jersey.

53.     Plaintiff Viteri purchased his vehicle primarily for personal, family, or household use.

54.     Safety and reliability were important factors in Plaintiff Viteri's decision to purchase his vehicle. Plaintiff Viteri reviewed the vehicle's Monroney window sticker and discussed the vehicle with an authorized VW dealership representative. Relying on these representations, Plaintiff Viteri believed that the Volkswagen Golf would be a safe and reliable vehicle. When Plaintiff Viteri purchased his vehicle, he was unaware that the vehicle contained the Suction Pump Defect.

55.     Plaintiff Viteri was never informed by Defendants that his vehicle suffered from the Defect. Defendants' omissions were material to Plaintiff Viteri. Had Defendants disclosed their knowledge of the Defect before he purchased his vehicle, Plaintiff Viteri would have seen and been aware of the disclosures.

Furthermore, had he known of the Defect, Plaintiff Viteri would not have purchased his vehicle, or would have paid less for it.

56.     In or about 2019, Plaintiff Viteri began to experience the Defect. Specifically, Plaintiff Viteri smelled gas from inside the cabin of the vehicle.  He took the vehicle to an authorized Volkswagen dealership, where he was told that the fuel pump needed to be replaced and quoted him $3,900 for this repair. Plaintiff Viteri had the repair done. However, the cabin of the vehicle still smells strongly of gas. To date, Plaintiff Viteri's vehicle has not been permanently repaired and continues to be defective.

57.     As a result of the Suction Pump Defect, Plaintiff Viteri has lost confidence in the ability of his Class Vehicle to provide safe and reliable transportation for ordinary and advertised purposes. Further, Plaintiff Viteri will be unable to rely on the Class Vehicles' advertising or labeling in the future, and so will not purchase or lease another Class Vehicle, although he would like to do so.

58.     At all times, Plaintiff Viteri, like all class members, has driven his vehicle in a manner both foreseeable and in which it was intended to be used.

**<u>Defendants</u>**

59.     Defendant VWGoA is a New Jersey corporation with its headquarters and its principal place of business at 1950 Opportunity Way, Suite 1500, Reston, Virginia 20190. At this facility, VWGoA coordinates the United States operations and activities of the Volkswagen, Audi, Bentley, Bugatti, and Lamborghini brands, as well as the activities of its 10,000 employees and its subsidiaries, VW Credit, Inc. and U.S. Volkswagen Group of America Chattanooga Operations, LLC, which

manufacturers Volkswagen-branded vehicles. One of VWGoA's fictitious names is Audi of America, Inc., which it has registered with the Virginia Secretary of State.

60.     Defendant VWGoA, through its various entities, markets, distributes, warranties, and sells Volkswagen and Audi-branded automobiles and parts for those automobiles, including the Class Vehicles, in multiple locations across the United States including Florida, Hawaii, Missouri, and New Jersey.  VWGoA maintains many operational facitilities throughout the United States to effectively market, distribute, warrant and sell, including Technical Centers in both New Jersey and California, a proving ground in Arizona, a manufacturing facility in Tennessee, parts distribution centers in California, Texas, Wisconsin, New Jersey, regional offices in New Jersey, Illinois, Texas, Georgia, and California, and a product liaison facility in New Jersey.

61.     In order to sell vehicles to the general public, VWGoA enters into agreements with authorized dealerships who engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new Volkswagen branded vehicles, authorized dealerships are also permitted to service and repair these vehicles under the warranties VWGoA provides directly to consumers who purchased new vehicles from the authorized dealerships. All service and repair at an authorized dealership is completed according to VWGoA, Audi AG, and VWAG instructions, issued through service manuals, TSBs,  technical tips ("TT"), and other documents. Per the agreements between VWGoA and the authorized dealers, consumers such as Plaintiffs are able to receive services under VWGoA's issued warranty at dealer locations that are convenient to them, making Plaintiffs and

consumers the third-party beneficiary of these contracts. These agreements provide VWGoA with a significant amount of control over theactions of the authorized dealerships, of which there are nearly 1,000 in the United States.

62.     VWGoA, in conjunction with VWAG and Audi AG, drafted the warranties it provides directly to consumers such as Plaintiffs. These warranties are provided on a take-it-or-leave-it basis and give VWGoA the sole power in determining whether a repair is coverable by the warranty. VWGoA designated its authorized dealerships as its agents to perform warranty repairs.

63.     VWGoA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. VWGoA is also responsible for the content of the Monroney Stickers on Volkswagen and Audi-branded vehicles, the information for which comes from the manufacturers, VWAG and Audi AG respectively. VWGoA further is the designated agent of VWAG and Audi AG in fulfilling the manufacturers' reporting, recall, and other duties under federal motor vehicle safety laws and in interfacing with NHTSA.

64.     Defendant Volkswagen AG is a German corporation headquartered in Germany with its principal place of business at Berliner Ring 2, 38440, Wolfsburg, Germany. This facility also encompasses a 70 million square foot manufacturing facility, the Wolfsburg Volkswagen Plant, where over 800,000 vehicles are produced each year.  The Wolfsburg headquarters also have individual production facility, speciality production plants, warehouses, and administration buildings, with over 20,000 employees. VWAG designs, engineers, manufactures, tests, markets,

supplies, sells and distributes Volkswagen, Skoda, and some Audi-branded vehicles and parts for those vehicles worldwide, including in the United States.

65.    VWAG is the parent corporation of VWGoA and Audi AG, which are each wholly owned subsidiaries. VWAG is also the ultimate parent corporation of the United States manufacturing facilities for Volkswagen and Audi branded vehicles.  For all its United States subsidiaries, including VWGoA, VWAG provides all the technical and information for the purpose of manufacturing, servicing, and repairing the Volkswagen-branded Class Vehicles. VWAG selected New Jersey for the original site of VWGoA's headquarters and chose to have VWGoA incorporated as a New Jersey entity. Each year since 2016, VWAG has reported over 35 billion euros (or over 41 billion in U.S. dollars) of revenue from its North American activities via VWGoA and its network of authorized dealerships.

66.    Defendant Audi AG is an entity incorporated and registered in Germany with its principal place of business at Auto-Union-Str. 2 D-85045, Ingolstadt, Germany. The Ingolstadt facility encompasses both corporate offices, which coordinate and supervise its worldwise operations, and a factory totally over 30 million square feet, which produces over 300,000 vehicles a year and employs over 40,000 people. Audi AG designs, manufactures, engineers, tests, markets, supplies and distributes Audi-branded vehicles and parts for those vehicles worldwide, including in the United States.

67.    The relationship between VWAG, Audi AG, and VWGoA is governed by a General Distributor Agreement that gives Audi AG and/or VWAG the right to control nearly every aspect of VWGoA's operations related to both Volkswagen and

Audi-branded vehicles—including sales, marketing, management policies, information governance policies, pricing, and warranty terms.

68.    For all VWAG United States subsidiaries, including VWGoA, VWAG and/or Audi AG provides all the technical information for the purpose of servicing and repairing the Class Vehicles, as well as the information needed to draft the owners' manuals.

69.    Defendants manufactured, marketed, sold and warranted the Class Vehicles, including Plaintiffs' vehicles.

**FACTUAL ALLEGATIONS**

70.    For years, VW has designed, manufactured, distributed, sold, leased and warranted the Class Vehicles. VW has marketed and sold hundreds of thousands of Class Vehicles nationwide, including through their nationwide network of authorized dealers and service providers.

**I.    The Defect**

**a.  Backround of the Subject Fuel System and Suction Jet Pump**

71.    A fuel system in any motor vehicle operates to help transfer fuel from the fuel tank to the engine for combustion. The system consists of several components, including, *inter alia,* the fuel tank, fuel pump, various connector hoses and lines, and the fuel injector.

72.    In Class Vehicles, the fuel system also includes a suction jet pump. The suction jet pump, along with the fuel pump, are located in the Class Vehicles' fuel tank. Figures One and Two below depict the subject suction jet pump from two different angles.

   

Fig. 1                              Fig. 2

73.    Figure Three below depicts the subject fuel tank, in green.



Fig. 3

74.    In Class Vehicles, the fuel tank is whats known as "saddle style," meaning it consists of two chambers; primary and secondary. In one chamber, there is a delivery module with an electric fuel pump inside. This fuel pump transfers fuel from the gas tank to the engine.  The suction jet pump is located in the other fuel

19

tank chamber and, in contrast to the fuel pump, recieves no external motive power such as from an electric motor.

75.     Instead, the flow of the fuel in the tank powers the suction jet pump so it can transfer fuel from its chamber to the other[1], where the fuel pump can then deliver a consistent flow of fuel to the vehicle's engine.

### b. Backround of the Evaporative Emission Control (EVAP) System

76.     The fuel tank described above is connected to the Class Vehicles' EVAP system via a vent line. The EVAP system is intended to capture gasoline fumes and other emissions produced when fuel evaporates within the fuel tank and fuel system. When operating properly, the system then returns these emissions to the combustion process (i.e. to the primary fuel tank chamber wherein the suction jet pump is located) to keep harmful chemicals from reaching the exterior of the vehicle and polluting the air.

77.     The EVAP system in Class Vehicles consists of, *inter alia,* various leak detection pumps and sensors, connector lines/hoses, and a vapor canister (also known as a charcoal filter or canister). The charcoal canister is filled with activated charcoal that absorbs gas vapors and emissions until the engine is started.

78.     The charcoal canister, as well as the Class Vehicles' fuel tank, are located in the rear of the vehicle, underneath the rear passenger seats. This arrangement is depicted below in Figure Four.

---

[1] All suction jet pumps work according to Bernoulli and Venturi's principles of fluid dynamics, including the suction jet pumps in the Class Vehicles.



Fig. 4

### c.  The Defect's Operation and Effect on the Class Vehicles

79.     At the time each Class Vehicle left VW's possession and control, each incorporated the same suction jet pump. Discovery will show that the Defect is the result of: 1) inadequately designed, manufactured, or installed seals in the sunction jet pump; 2) the use of inadequate materials in the suction jet pump which begin to degrade from the moment the pump is exposed to fuel; 3) improper design of the gas tank and/or the sunction jet pump; and/or 4) improper design of the fuel system itself, when using a sunction jet pump.

80.     These suction jet pumps not only have a high risk of failure but also increases the risk of fuel egress from the fuel tank to the EVAP system.

81.     When there is fuel ingress to the EVAP system, fuel travels through the vent line to the charcoal canister. As the charcoal canister absorbs this fuel, it overfills and leaks fuel, both to the outside of the vehicle and into the rear vehicle cabin.  As result, Plaintiffs and Class members experience fuel leaks, premature fuel nozzle shutoffs due to the built up pressure in the gas tank from evaporated fuel and

emissions that has not been used, inability to fill up, hissing noises when the gas tank cap is unscrewed,  fuel spillbacks, and/or gas odor inside their vehicles.

82.     The ability of a vehicle to provide motive power goes to the essential function of the vehicle.  The Class Vehicles are unable to provide motive power without fuel.  As such, the correct design and implementation of every piece of the fuel system in the Class Vehicles is essential.  As all of the Class Vehicles have the same suction jet pump and related components, each of the Class Vehicles has an inherent and uniform latent Defect that effects the most basis function of the vehicle.

## II.     The Warranty

83.     VW provided all purchasers and lessees of the Class Vehicles with a New Vehicle Limited Warranty (the "NVLW" or "Warranty") with the purchase or lease of the Class Vehicles.

84.     The Warranty provides a 3-year/36,000-mile for Volkswagen vehicles or a 4-year/50,000-mile warranty for Audi vehicles and certain Volkswagen vehicles starting with model year 2020.  The Warranty expressly covers defects in materials or workmanship.

85.     VW represents as part of its Warranty terms that "This New Vehicle Limited Warranty is automatically transferred without cost if the ownership of the vehicle changes within the Warranty period." In other words, the Warranty remains with the vehicle to the benefit of subsequent purchasers throughout the duration of the Warranty period.

86.     Using the 2016 Warranty by way of example, the Warranty states in relevant part:

**What is covered**

**Coverage**

This limited warranty covers any repair to correct a defect in manufacturer's material or workmanship (i.e., mechanical defects), except wheel alignment * , tire balance *, and the repair or replacement of tires.

**Free-of-charge repair**

Repairs under this limited warranty are free of charge. Your authorized Volkswagen dealer will repair the defective part or replace it with a new or remanufactured genuine Volkswagen part.

87.     Despite the fact that the NVLW is provided by VWGoA, the copyrights to the warranty terms are held by the vehicle's manufacturers, either VWAG for Volkswagens or Audi AG for Audi vehicles.   As such, the warranty booklets provided to Plaintiffs and consumers by VWGoA are done so with the explicit permission and direction of VWAG or Audi AG.  Moreover, VWAG or Audi AG is the author of the warranty terms.

88.     VWGoA also provides "Certified Pre-Owned Limited Warranty" to vehicles purchase as certified pre-owned from a dealership.  Such vehicles are inspected by the dealership, who provides a report to VWGoA. VWGoA then authorizes the vehicle to be sold as certified pre-owned and provides a separate warranty for those vehicles, extending the coverage of the NVLW for an additional five years from the vehicle's original in-service date with no mileage limitation.  If the NVLW has already expired, the vehicle receives another 12 months of NVLW coverage for the new owner.  In all other respects, the coverage terms of the CPO Limited Warranty are similar to the terms of the New Vehicle Limited Warranty.

89.     VW also provides an eight-year, 80,000 mile emissions warranty, under which major emissions control parts are covered.  VW also provides an eight-year, 80,000 mile which ever comes first for the fuel pump control module.

90.     Unlike many car companies, VW does not not make its owners' manuals and warranty booklets available online prior to purchase. In order to access such materials on VW's websites, a consumer needs a Vehicle Identification Number. As such, the full warranty terms are presented to Plaintiffs and consumers after the purchase, on a take-it-or-leave-it basis.

91.     The warranties and representations contained in the Warranty were and are material to Plaintiffs because Plaintiffs would not have purchased the Class Vehicles or would not have paid as much as they did if they had known that VW would be unable or unwilling to repair a dangerous defect like the Suction Pump Defect which is covered under multiple warranties given by VW to Plaintiffs and Class Members.

**III.   The  Suction Pump Defect Poses A Serious Safety Concern**

92.     The Suction Pump Defect presents a safety hazard that renders the Class Vehicles unreasonably dangerous.

93.     The Suction Pump Defect is dangerous, causing fuel leaks, premature fuel nozzle shutoffs, fuel spillbacks, and/or gas odor inside the Class Vehicles, thereby creating the risk of a fire.

94.     Federal law requires automakers like Defendants to be in close contact with NHTSA regarding potential automobile defects, and imposes a legal requirement (backed by criminal penalties) compelling the confidential disclosure of defects and related data by automakers to NHTSA, including field reports, customer complaints, and warranty data. *See TREAD Act,* Pub. L. No. 106-414, 114 Stat.1800 (2000).

95.     Automakers have a legal obligation to identify and report emerging safety-related defects to NHTSA under the Early Warning Report requirements. *Id.* Similarly, automakers monitor NHTSA databases for consumer complaints regarding their automobiles as part of their ongoing obligation to identify potential defects in their vehicles, including those which are safety related. *Id.* Thus, Defendants knew or should have known of the many complaints about the Suction Pump Defect logged by NHTSA Office of Defects Investigation (ODI). The content, consistency, and disproportionate number of those complaints alerted, or should have alerted, Defendants to the Suction Pump Defect.

96.     With respect solely to the Class Vehicles, the following are but a few examples of the many complaints concerning the Suction Pump Defect which are available through NHTSA's website, www.safercar.gov. Many of the complaints reveal that Defendants, through their network of dealers and repair technicians, have been made aware of the Suction Pump Defect. In addition, the complaints indicate that despite having knowledge of the Suction Pump Defect and even armed with knowledge of the exact vehicles affected, Defendants often refused to diagnose the defect or otherwise attempt to repair it while Class Vehicles were still under

warranty. (Spelling and grammar mistakes remain as found in the original):

**2015 Volkswagen Golf**

a.    **DATE OF INCIDENT:** April 26, 2024

**DATE COMPLAINT FILED:** April 26, 2024

**NHTSA/ODI ID:** 11585517

**SUMMARY:** The contact owns a 2015 Volkswagen Golf. The contact received notification of NHTSA Campaign Number: 24V110000 (Fuel System, Gasoline) however, the part to do the recall repair was not yet available. The contact stated that the manufacturer had exceeded a reasonable amount of time for the recall repair. The dealer was contacted and confirmed that parts were not yet available. The manufacturer was made aware of the issue and informed the contact that a second notice would be mailed when parts became available. The contact had not experienced a failure. VIN tool confirms parts not available.

b.    **DATE OF INCIDENT:** March 1, 2022

**DATE COMPLAINT FILED:** December 2, 2022

**NHTSA/ODI ID:** 11495757

**SUMMARY:** The contact owns a 2015 Volkswagen Golf. The contact noticed that the fuel pump would frequent stop while fueling the vehicle. The contact then stated that while his vehicle was being driven by a valet, fuel began to pour out of the fuel tank while on an incline. The valet attendant managed to drive the vehicle down a decline which

stopped the leak. Despite the failure, the contact was able to drive the vehicle home. The vehicle was then driven to a dealer where a diagnostic test was performed. The dealer informed the contact that the suction pump, seal, and emission filter needed to be replaced. Upon investigation, the contact linked the failure to NHTSA Campaign Number: 16V647000 (Fuel System, Gasoline, Engine and Engine Cooling) however, the VIN was not included in the recall. The manufacturer was notified of the failure and informed him that the vehicle was no longer under warranty. The vehicle had yet to be repaired and remained in the possession of the dealer. The failure mileage was approximately 115,000.

**2016 Volkswagen Golf**

c. **DATE OF INCIDENT:** February 1, 2024

**DATE COMPLAINT FILED:** February 9, 2024

**NHTSA/ODI ID:** 11571071

**SUMMARY:** The contact owns a 2016 Volkswagen Golf. The contact stated while driving approximately 35 MPH, there was an abnormally strong gasoline odor in the cabin of the vehicle. The contact drove to the residence and became aware that there was a puddle of gasoline under the passenger's side rear wheel nearby the fuel tank. The contact stated no warning light was illuminated. The contact had the vehicle towed to a local dealer, where it was diagnosed and determined that the fuel tank needed to be replaced. The vehicle was not repaired. The

manufacturer was informed of the failure. The failure mileage was approximately 41,000.

**d. DATE OF INCIDENT:** May 23, 2024

**DATE COMPLAINT FILED:** May 24, 2024

**NHTSA/ODI ID:** 11590634

**SUMMARY:** We are unable to fill up the gas tank due the recall issue. The dealership says we can bring it in and they will repair but at this time we would have to pay for the repair. VW has not come up with a fix for the recall problem at this time. This problem has rendered our vehicle not drivable. What is the recourse? Fuel also leaks out when trying to fill the gas tank. It could start a fire.

**e. DATE OF INCIDENT:** April 24, 2024

**DATE COMPLAINT FILED:** May 14, 2024

**NHTSA/ODI ID:** 11588794

**SUMMARY:** My vehicle is leaking fuel. I have been unable to drive it for a few weeks due to the recall not having an approved repair. The dealership did not offer me any solution other than to pay for the repair out of pocket. This has been a known issue since February and no remedy is available from Volkswagen.

**f. DATE OF INCIDENT:** April 1, 2024

**DATE COMPLAINT FILED:** April 30, 2024

**NHTSA/ODI ID:** 11586168

**SUMMARY:** When refueling, the gasoline spills out and can't fill the tank. Took the car to the dealer and they are asking for 2,500$ for repair.

g. **DATE OF INCIDENT:** June 25, 2023

**DATE COMPLAINT FILED:** July 5, 2023

**NHTSA/ODI ID:** 11530543

**SUMMARY:** My vehicle is unable to fuel up, when attempting to fuel at the pump the fuel will build up in the filler neck causing the pump ti stop and fuel spill out from the filler neck and when driven, fuel will begin to leak from the EVAP canister located on the right rear of the vehicle. Dealership is unwilling to correct this issue as it is a known issue to them of the problem

**2017 Volkswagen Golf**

h. **DATE OF INCIDENT:** May 14, 2024

**DATE COMPLAINT FILED:** March 1, 2024

**NHTSA/ODI ID:** 11588685

**SUMMARY:** Related to recall 20UF. VWoA refused to authorize repair under recall in March. My 2017 GTI is diagnosed with all symptoms of the 20UF recall. Random power loss, inability to add fuel, large fuel leak from rear fender (charcoal canister). I have been unable to drive the car since March, but VWoA refuses to pay for the repair. The recall was issued 3 months ago and there is still no repair, or offer from VWoA to give a loaner car or anything.

    **i.** **DATE OF INCIDENT:** April 6, 2024

       **DATE COMPLAINT FILED:** April 7, 2024

       **NHTSA/ODI ID:** 11581571

       **SUMMARY:** VW is not acting fast enough to fix the active fuel tank suction jet pump recall, given the immense danger risk. The recall was issued a month and a half ago - they should have the parts available now to fix it. I have noticed fuel smells while inside and driving my car on and off for several months now!! I took my car to their dealership yesterday to get their faulty water tank replaced and when I asked about the recall I was completely dismissed and they said they had no idea when the parts would be available. I need my car to get to work. I can't just stop driving it but it feels incredibly unsafe to drive now that I know about the recall!

**2018 Volkswagen Golf**

    **j.** **DATE OF INCIDENT:** August 11, 2023

       **DATE COMPLAINT FILED:** August 13, 2023

       **NHTSA/ODI ID:** 11538196

       **SUMMARY:** During refueling after low fuel indicator, fuel tank was not able to accept any fuel. During a second attempt, vehicle accepted 0.25 gallons but all of this fuel came gushing out of the tank from the inlet and from the passenger side rear wheel well. Fuel kept leaking for another 20miles until vehicle was taken to the Rochester Hills, MI VW dealership. The vehicle continued to leak fuel at the dealership and I

was requested to park outside due to the risk of a fire. During this 20mile trip, engine was very hesitant and spluttered and almost stalled. No warning lights on dash. My personal safety was at risk since any ignition source would cause a fire due to this fuel leak, vehicle did not show any warning lights besides low fuel. VW dealership information was that the fuel tank suction jet pump needs replacement. No information was shared if the component will be sent to the manufacturer for inspection. No information how this new pump will not cause a repeat event.

### 2015 Audi A3

k. **DATE OF INCIDENT:** April 18, 2024

**DATE COMPLAINT FILED:** May 6, 2024

**NHTSA/ODI ID:** 11587211

**SUMMARY:** The contact owns a 2015 Audi A3. The contact stated that while her husband was attempting to park the vehicle in the driveway, he noticed a strong fuel odor. The contact's husband inspected the vehicle and noticed a fuel leak from the fuel tank pump. The contact husband refilled the fuel tank, however, the failure persisted. The vehicle was taken to a local dealer where it was diagnosed that the charcoal canister and a filter needed to be replaced. The contact stated that the dealer confirmed an unknown recall was not related to the failure. The vehicle was not repaired. The manufacturer was made aware of the failure; however, the contact was referred to the

NHTSA Hotline for assistance. The approximate failure mileage was 150,000.

**l.**   **DATE OF INCIDENT:** May 3, 2024

**DATE COMPLAINT FILED:** May 3, 2024

**NHTSA/ODI ID:** 11586864

**SUMMARY:** The contact owns a 2015 Audi A3. The contact received notification of NHTSA Campaign Number: 24V110000 (Fuel System, Gasoline) however, the part to do the recall repair was not yet available. The contact stated while driving 35-38 MPH, the vehicle shuddered, and there was a strong gasoline odor coming from the A/C vents. There was no warning light illuminated. The contact pulled to the side of the road, turned off and exited the vehicle. The contact's father arrived at the scene and inspected the vehicle. The contact then drove to the residence. Additionally, the contact stated that while attempting to refuel the vehicle at the gas station, the gas pump stopped pumping gas in the vehicle even though the gas tank was not full. The contact stated that the vehicle had been leaking fuel while parked in the driveway. The contact's father pushed the vehicle to the side of the road. The local dealer was contacted. The vehicle was not diagnosed or repaired. The contact stated that the manufacturer had exceeded a reasonable amount of time for the recall repair. The manufacturer was not made aware of the failure. The failure mileage was approximately 83,000. VIN tool confirms parts not available.

**m. DATE OF INCIDENT:** August 20, 2022

**DATE COMPLAINT FILED:** September 1, 2022

**NHTSA/ODI ID:** 11482470

**SUMMARY:** The contact owns a 2015 Audi A3. The contact stated that while her husband was driving at an undetermined speed, the fuel level decreased. The driver noticed that fuel was pouring out of the vehicle. The driver added fuel to the vehicle and continued driving. The vehicle was parked for several days. While the contact was driving the vehicle, the vehicle worked as designed. The contact stated that while driving, she was informed by another motorist that fuel was leaking from the vehicle. The contact pulled up to the gas station and became aware that fuel was pouring out of the nozzle. There was an odor of fuel detected inside the vehicle. The contact was able to add fuel. The vehicle was taken to the local dealer where it was diagnosed that the suction pump and EVAP system were inoperable. The vehicle was not repaired. The manufacturer was contacted and informed that the vehicle was repaired in 2018 under NHTSA Campaign Number: 16V647000 (Fuel System, Gasoline, Engine and Engine Cooling) but provided no additional assistance. The failure mileage was approximately 162,000.

**n. DATE OF INCIDENT:** August 16, 2021

**DATE COMPLAINT FILED:** September 7, 2021

**NHTSA/ODI ID:** 11432014

**SUMMARY:** The contact owns a 2015 Audi A3. The contact stated that while refueling the vehicle, the contact noticed that the fuel door was sticking. The vehicle was taken to the local dealer and diagnosed with a faulty fuel actuator which needed to be replaced. The vehicle was not repaired. The manufacturer was notified of the failure however, no further assistance was provided. The failure mileage was approximately 63,000.

**2016 Audi A3**

   o.  **DATE OF INCIDENT:** February 1, 2023

      **DATE COMPLAINT FILED:** February 16, 2023

      **NHTSA/ODI ID:** 11507697

      **SUMMARY:** The contact owns a 2016 Audi A3. The contact stated while refueling the vehicle, gasoline sprayed out from the fuel filler neck. The vehicle was taken to an independent mechanic and the contact was informed of a malfunction with the filler neck. The vehicle was not repaired. The manufacturer was contacted and notified of the failure but offered no assistance. The failure mileage was 8,000.

   p.  **DATE OF INCIDENT:** October 10, 2021

      **DATE COMPLAINT FILED:** October 19, 2021

      **NHTSA/ODI ID:** 11437383

**SUMMARY:** The contact owns a 2016 Audi A3. The contact stated while driving 40 MPH, he started to smell gasoline fumes inside the vehicle. The contact stated that there was no warning light illuminated. The contact was able to drive to a nearby gas station and noticed a fuel leak. The contact was able to drive to his destination. The contact stated he replaced the fuel cap and evaporator air filter, the fuel pressure sensor, and the evaporator purge valve but continued to experience the failure. The contact called the local dealer and made them aware of the failure. The vehicle was not diagnosed or repaired. Upon investigation, the contact associated the failure with NHTSA Campaign Number: 16V647000 (Fuel System, Gasoline, Engine and Engine Cooling) however, the VIN was not included. The manufacturer had been informed of the failure. The failure mileage was approximately 65,000.

## 2017 Audi A3

q. **DATE OF INCIDENT:** June 17, 2022

**DATE COMPLAINT FILED:** July 7, 2022

**NHTSA/ODI ID:** 11472767

**SUMMARY:** The contact owns a 2017 Audi A3. The contact stated while refueling the vehicle, fuel was spilling from the fuel filler neck. The contact drove back to her residence and placed the vehicle in park(P) and noticed the odor of gasoline entering the cabin. The contact stated that the check engine warning light was illuminated. The contact exited and checked the gas cap and noticed that fuel was pouring from

under the passenger's side rear tire. The contact had the vehicle towed to a certified mechanic who diagnosed that the fuel tank needed to be replaced. The vehicle was repaired. The manufacturer had not been informed of the failure. The failure mileage was approximately 42,800. The consumer stated that they reached out to Audi USA/Volkswagen for a reimbursement for the replacement of the fuel tank, the request was denied.

**Customer Complaints on Third-Party Websites**

97.     Similarly, complaints posted by consumers in internet forums demonstrate that the defect is widespread and dangerous and that it can manifest without warning and/or suitable repair. The complaints also indicate Defendants' awareness of the problems with the fuel tank, suction pump, and/or related components and how potentially dangerous the defect is for consumers, not only to the extent such complaints reference contact with authorized dealerships and Defendants itself, but also because VW employs staff to monitor the perception of the brand. The following are a sample of consumer complaints (spelling and grammar mistakes remain as found in the original):

    a.  September 4, 2019

        I'm reaching out in case anyone might have insight on this particular problem. My car has 69,000 miles and has been perfect without any issues until now. At first, I was having issues at the gas pump because the car would not take any gas. It would just start fueling and at like $1.00 the pump would click indicating that's it's full, when I barely had

any gas in the tank. I was told that this could potentially be an evap system leak. I took my car to this reputable VW shop where I live and they replaced the gas canister, which had been filled up with gasoline. I drove my car to the gas station and had the same issue. I could not fill the car up with gasoline again. It got worse. I was driving home and I smell this profound unburnt gasoline smell like at the gas station. I park my car and see gasoline leaking from my car. I slowly drove it home but was losing gas fast. As it stands, the car is safely stationary at home completely empty on gas. The car will need to be towed to either a shop or the dealer. I don't even know if going through my insurance is an option. Has anyone had any similar experience or have any insight on what could possibly be going on?

https://www.golfmk7.com/forums/index.php?threads/mk7-gti-gasoline-leak-problem.367363/

b. July 1, 2020

I have a 2016 Golf R with over 50,000 miles and my car just started not letting me put gas in. Only the filler tube fills up. I took everything apart (except the filler neck, because I don't see how its serviceable or removable from the tank) and found that the EVAP can was full of gas. I blew into the lines on the can and gas poured out the filter on the can. So for you folks that are seeing or smelling gas this is how it is escaping at the passenger wheel well. I dried it and reassembled it and drove to put some gas in and it still wouldn't allow it. I pulled off the large vent

line on the evap can while at the gas station and it still wouldn't let me put any gas in. I also used a silicone hose to push open the flapper (980mm per Erwin) that sits at the bottom of the filler neck where it fits into the tank, and it still wouldn't let me put any gas in. A GTI owner suggested that its the suction jet pump, because that is what fixed his problem. The problem with this is that the jet pump is not serviceable on the NA R, and my car is not listed on the recall. I put a boreascope in the tank, and you physically cant get to the other side of the tank because of the driveshaft hump. The other problem with this is that as far as I can tell the jet pump is working exactly as it should. I can watch the VCDS readings on the two floats. I emptied gas on the passenger side of the tank, started the car and watched the fuel level drop on the drivers side and rise on the passenger side.

I've been looking at different parts breakdowns of the fuel tank and I cant find a rollover valve listed for the MK7 and I think its because its built into the filler neck somewhere. If I could get to the rollover valve I could possibly exercise it and maybe it would start working again. Otherwise from reading the previous posts it sounds like I have to replace the whole damn fuel tank on my dime. This shit sucks... Anyone have any more information or suggestions on this?

https://www.golfmk7.com/forums/index.php?threads/mk7-gti-gasoline-leak-problem.367363/page-2

c. <u>September 16, 2021</u>

Hey guys, I'm sadly suffering the same issue on my 2017 golf - gas in my charcoal canister and EVAP system. Plus, my gas tank is bulging from high pressure due to a fuel tank vent valve that's stuck closed. They need to replace the charcoal canister, gas tank, and various valves due to gas/charcoal contamination (N80 purge valve, venting valve, and leak detection pump) estimated $3200 for parts+labor+tax. Dealer is aware of the "20Y6" recall on older (2015-2016) golfs, but says my suction pump "looks fine". They think it was caused by overfilling - except that I never top off my car.

I have some questions for you guys:

#1: Is there some overfill-protection mechanism that failed in my car? E.g. the Toyota 2AZ-FE uses a "refueling valve" that closes the passage to the charcoal canister once the tank reaches a certain level. I feel like the dealer should check that out. I'm not sure what the equivalent is on VW, does anybody know?

#2: Should I ask the dealer to actually inspect/test all those valves (2 valves + leak detection pump), or is it a lost cause?

#2: Worth asking the dealer to identify the part number and date of the suction pump? Anyone know how to identify a faulty (pre-recall) suction pump?

https://www.golfmk7.com/forums/index.php?threads/mk7-gti-gasoline-leak-problem.367363/page-3

d. <u>September 22, 2021</u>

Another 2017 GTI reporting in. Car is under 45k miles. Felt bucking driving down the highway, I had a quarter tank left so when i got off i went to refuel. I managed to put less than a gallon in before the pump shut off. Since i felt bucking at a quarter tank, there's no way the evap canister was filled up due to overfilling (which i've never done), since I'm assuming it came from the N80 valve trying to get some vapors into the engine but couldn't since the canister is full of gas and that was the reason for the brief loss of power?

Dealer wants to replace the evap canister and the fuel tank. Contacted VWcare and some assistance is being offered but nowhere near 80-90% that you guys are saying. Not sure how to proceed, especially since one poster said the suction pump may be molded into the tank? And if it's replaceable, who's to say it won't fail again? I wonder if im just better off with a new tank because it looks like it's got some things the old one doesn't have.

https://www.golfmk7.com/forums/index.php?threads/mk7-gti-gasoline-leak-problem.367363/page-3

e. <u>November 29, 2023</u>

Hey yall!

Stopping in to share my experience and generate more literature on this because it saved me THOUSANDS.

A month or so ago, I noticed pressure in my gas tank. I would go to fill up and would hear a "hiss" when I opened the cap. Odd but not really hurting me. (Or was it? [it was]).

Then the day came that I couldn't put gas in the tank. The pump was choking and cutting off instantly.

Took it to a local euro shop believing it was just the carbon canister. So we replaced that. As you know, this did NOT solve my problem. Drove the car for a week, then went to fill up and there was pressure again and the pump was choking again. Took it back to the shop and the instant response was "we have to change the gas tank."

If you're familiar with this problem, then you know that /would/ fix the problem but is the NUCLEAR option.

Luckily, I had a slow day at work , found a vortex post about this issue and then a Reddit post on the issue. That was it.

Those posts advise that there is a ~$30 part inside the gas tank (the suction jet pump) which has likely gone bad. I presented this to my mechanic, who said "hell, let's try it." (Thankfully).

He had trouble finding it in my car as the pump was still partially submerged. FYI, it's a little to the left and down inside the tank.

Of course, driving a 2017, I missed the recall. I'll be calling up to VW HQ or at least my local dealership to see if there's anything can be done about my out of pocket on this issue, though I'm not entitled to it (having missed the recall) nor am I expecting it.

Anyway, if you've found this, try the suction jet pump if they suggest replacing the fuel tank.

https://www.reddit.com/r/GolfGTI/comments/1878ptk/suction_jet_pump/

**IV.    VW Had Superior and Exclusive Knowledge of the Suction Pump Defect**

98.    VW fraudulently, intentionally, negligently and/or recklessly omitted and concealed from Plaintiffs and members of the Class the Defect in Class Vehicles, even though VW knew or should have known of the design, material, manufacturing, and/or workmanship defects in the Class Vehicles.

99.    Since 2014, VW has designed, manufactured, distributed, sold and leased the Class Vehicles. Because VW has extensive knowledge about the important of the proper functioning of the fuel system, and further demands particularly robust pre-production and pre-sale testing of new models, VW knew about the Defect prior to the sale of the Class Vehicles.

100.   Knowledge and information regarding the Defect were in the exclusive and superior possession of VW and its network of authorized dealerships, and that information was not provided to Plaintiffs and members of the Classes – either before their purchase or lease of Class Vehicles or when they sought repairs for their vehicles.  Based on pre-production testing, pre-production design failure mode analysis, production design failure mode analysis, previous failures of fuel pump and fuel pump control modules from the same supplier, quality control audits of the fuel pump and fuel pump control modules components, early consumer complaints

42

made to VW's network of dealerships, aggregate warranty data compiled from those dealers, repair orders and parts data received from those dealers, aggregate auto parts stores, consumer, and independent mechanic orders of replacement parts, and consumers complaints to dealers and NHTSA and testing performed in response to those complaint, *inter alia*, VW was aware or should have been aware of the Defect in the Class Vehicles.  Instead, VW fraudulently concealed the Defect and its associated safety risk from Plaintiffs and members of the Classes.

101. VW is experienced in the design and manufacturer of consumer vehicles. As an experienced manufacturer, VW conducts tests, including pre-sale durability testing, on incoming components as well as on its own assembly process to verify the vehicles are free from defect and align with VW's specifications.[2] Thus, VW knew or should have that the Defect was likely to put drivers in a dangerous position due to the inherent risk of the Defect.

102. Specifically, VW's preproduction testing includes extensive road testing as its providing grounds in Ehra-Lessien, Germany, as well as in other proving grounds such as the VWGoA facility in Arizona. There, testing includes materials testing as well as a rigorous review of its assembly procedures. VW is known to spend more for research and development than any other major vehicle

---

[2] Akweli Parker, *How Car Testing Works*, HOWSTUFFWORKS.COM, http://auto.howstuffworks.com/car-driving-safety/safety-regulatory-devices/car-testing.htm ("The idea behind car testing is that it allows manufactures to work out all the kinks and potential problems of a model before it goes into full production.") (last viewed June 5, 2019).

manufacturer in the worlds and produces far more pre-production vehicles.[3] In fact, VW even mistakenly once sold nearly 7,000 pre-production models, which were meant to be destroyed, to consumers.[4]

103. VW knew, or should have known, that the Defect and the associated safety risk was material to owners and lessees of Class Vehicles and was not known or reasonably discoverable by Plaintiffs and members of the Classes before they purchased or leased Class Vehicles or within applicable warranty periods.

104. Notwithstanding VW's exclusive and superior knowledge of the Defect, VW failed to disclose the Defect to consumers at the time of purchase or lease of the Class Vehicles (or any time thereafter) and continues to sell Class Vehicles suffering from the Defect. VW intentionally concealed that the Defect presents a safety risk to consumers, including Plaintiffs and members of the Classes, and the public. The pre-production testing and quality control audits on the 2015 model year Class Vehicles thus revealed the Defect to VW.

105. Since 2015, if not earlier, VW has designed, manufactured, distributed, sold, and leased the Class Vehicles. As the designer, manufacturer, distributor, seller, and lessor of the Class Vehicles, VW knew or should have known about the Defect and its existence in the Class Vehicles.

---

[3] Christiaan Hetzner, *Inside Volkswagen's secret Ehra-Lessien proving grounds*, AUTOWEEK.COM, https://www.autoweek.com/news/technology/a1828046/volkswagens-secret-ehra-lessien-proving-grounds/ (last viewed April 19, 2021).

[4] Kyle Hyatt, *VW sold at least 6,700 preproduction cars to consumers and that's not good*, CNET.com, https://www.cnet.com/roadshow/news/vw-preproduction-test-cars-sold-to-public/ (last viewed April 20, 2021)

106.  Discovery will thus show the Class Vehicles are defective in that they are designed, manufactured, and/or installed in a manner that causes fuel leaks, premature fuel nozzle shutoffs, fuel spillbacks, and/or gas odor inside the vehicle. The Defect increases the risk of a fire.

107.  Defendants had superior and exclusive knowledge of the Suction Pump Defect and knew or should have known that the Defect was not known or reasonably discoverable by Plaintiffs and Class Members before they purchased or leased the Class Vehicles.

108.  Defendants' warranty department similarly analyzes and collects data submitted by its dealerships to identify warranty trends in its vehicles. It is Defendants' policy that when a repair is made under warranty the dealership must provide Defendants with detailed documentation of the problem and a complete disclosure of the repairs employed to correct it. Dealerships have an incentive to provide detailed information to Defendants, because they will not be reimbursed for any repairs unless the justification for reimbursement is sufficiently detailed.

109.  On September 2, 2016, VW issued a Safety Recall Report (Manufacturer Recall No. TBD) recalling certain 2015-2016 Audi A3 Cabriolet, 2015-2016 Audi A3 Sedan, 2015-2016 Volkswagen Gold, 2015-2016 Volkswagen GTI, and 2015-2016 Volkswagen Golf SportWagen vehicles. The Safety Recall Report ("2016 Recall") described the defect as follows:

> The suction pump inside the fuel tank designed to purge fuel from the Evaporative Emissions (EVAP) system may be compromised resulting in fuel flowing directly into the EVAP system. If this happens, fuel could accumulate in the EVAP system and leak through the charcoal canister filter element

110.   The subsequent Safety Recall Report in October 2016 describes the Remedy Program as follows:

> The potentially affected suction pump inside the fuel tank will be replaced. Reimbursement should not occur as vehicles are still covered under New Vehicle Limited Warranty.

111.   The 2016 Recall describes the safety risk of this defect as follows:

> Leaking fuel, in the presence of an ignition source, may result in a fire.

112.   In a Recall Acknowledgement letter dated October 6, 2016, VW stated that "[p]arts are not currently available. An interim notice will be sent to owners by early November and a second notice will be sent when parts are available."

113.   The 2016 Recall also included a "Chronology." Per the Chronology, VW was undeniably aware of the Suction Pump Defect as early as July/August 2015 when failures were reported from the field and investigation was initiated.

114.   On February 14, 2024, VW issued a Safety Recall Report (Manufacturer Recall No. VW: 20UF/AUDI: 20YF) recalling certain 2015-2019 Audi A3 Cabriolet, 2015-2020 Audi A3 Sedan, 2019-2020 Volkswagen Jetta GLI, 2015-2016 Volkswagen Gold, 2018 Volkswagen Golf SportWagen GP, 2018-2019 Volkswagen Golf SportWagen A7 vehicles, 2015-2017 Volkswagen Golf SportWagen, 2015-2020 Volkswagen Golf GTI, and 2015-2020 Volkswagen Golf A7 vehicles. The Safety Recall Report ("2024 Recall") described the defect as follows:

The suction jet pump inside the fuel tank is designed to purge fuel from the Evaporative Emissions (EVAP) system. If a specific seal inside an affected suction jet pump fails, the fuel may flow directly into the evaporative emissions (EVAP) system. If this happens, fuel could accumulate in the EVAP system and may leak through the charcoal canister filter element.

115.   The 2024 Recall describes the safety risk of this defect as follows:

Leaking fuel, in the presence of an ignition source, may result in a fire.

116.   The subsequent Interim Safety Recall Notice sent to consumers in April 2024 states that "[a] recall repair is not yet available" and:

Right now, your dealer does not have the recall remedy information available to perform the recall work. Volkswagen is working to make the recall remedy available as quickly as possible, and we will send you another letter once repairs can begin. At that time, you will be able to schedule this work with your authorized Volkswagen dealer. The recall work will be performed for you free of charge.

In the interim, if the recall condition exists in the vehicle, you could experience refueling issues (early stopping fuel nozzles, spillback) when fuel has accumulated in the EVAP system. A fuel odor may also be noticed by vehicle occupants. If you are experiencing these issues with your vehicle, please contact an authorized dealer to have the vehicle diagnosed without delay.

117.   According to the chronology submitted by VWGoA to NHTSA with the 2024 Recall, VW first became aware of the failures of the new suction jet pump used in the 2016 Recall in April 2018 when a new investigation was initiated.

118.   In both the 2016 Recall and the 2024 Recall, VW made premature decisions not to engage in recalls before being unable to deny a spike in suction jet pump failures. The 2016 Recall investigation was originally closed after the supplier supposedly made changes to the manufacturing process. For the 2024 Recall, it was NHTSA who put the topic of replaced suction jet pumps failing on the agenda for a September 2020 meeting with VWGoA and who then spent the next several years

demanding more information from VW about the failure rates.

119.  VW was aware in at least 2015, and likely several years before, that the Class Vehicles contained the Suction Pump Defect.

120.  Discovery will show that each TSB, customer satisfaction program, and service action issued by Defendants was approved by managers, directors, and/or executives at VW. Therefore, discovery will show that Defendants' managers, directors, and/or executives knew, or should have known, about the Defect, but refused to disclose the Defect to prospective purchasers and owners, and/or actively concealed the Defect.

121.  The existence of the Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Had Plaintiffs and other Class Members known of the Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

122.  Reasonable consumers, like Plaintiffs, expect that a vehicle's fuel tank and related components are safe, will function in a manner that will not pose a safety risk, and are free from defects. Plaintiffs and Class Members further reasonably expect that Defendants will not sell or lease vehicles with known safety defects, such as the Defect, and will disclose any such defects to its consumers when it learns of them. They did not expect Defendants to conceal and fail to disclose the Defect to them, and to then continually deny its existence.

## V.   VW's Omissions and Misrepresentations Regarding the Class Vehicles

123.   Notwithstanding VW's knowledge of the Defect, VW, through media outlets including VW media, touted the ability of the Class Vehicles to be driven reliably. The most basic task of any vehicle is to provide transportation, but VW failed to disclose the Defect interfered with that purpose in any of its statements about the Class Vehicles, including in brochures, Moroney Stickers, warranty booklets, and owner's manuals. VW's statements about both the Class Vehicles consistently touted the safety and fuel economy of the vehicles, without mentioning that the Defect which had an associated safety risk and negative effect on the fuel economy possible in the vehicles.

124.   For example, in the 2020 Volkswagen Golf Press Kit, VW stated, "Golf continues to represent a great value with a compelling combination of style, sporty handling, roominess, fuel efficiency, technology." Indeed, in the Press Kits for the 2016-2019 Golfs, VW made similar, if not duplicative, statements.[5] At no point did VW acknowledge that the Defect could interfere with vehicle handling and fuel capacity.

---

[5] 2019 Golf: "continues to represent a great value with a compelling combination of style, sporty handling, roominess, fuel efficiency, technology."
2018 Golf: "continues to represent a great value with a compelling combination of style, sporty handling, roominess, fuel efficiency, technology."
2017 Golf: "continues to represent a great value with loads of interior and cargo space, fuel-efficient engine choices and world-class engineering."
2016 Golf: "continues to represent a great value with loads of interior and cargo space, fuel-efficient engine choices and world-class German engineering."

125.   VW also extolled the many safety features of the 2020 Golf in its customer brochures, urging customers not to "pass up a chance for greater peace of mind," due to it being equipped with eight separate safety features including blind spot monitor, park assist, lane assist, and rear traffic alerts. VW failed, however, to mention the greatest safety risks of the vehicle, including the Defect, either in the brochure itself or in the owner's manual to which the brochure directed consumers to read "further details and important limitations."

126.   The 2022 and 2023 Volkswagen Taos brochures similarly advertise that the vehicle comes with "an always-safe drive thanks to a full suite of active safety features," including autonomous emergency braking, front and side assist, blind spot monitoring, and rear traffic alert. However, it fails to mention the Defect, neither in the brochures nor the owner's manuals, to which consumers are directed for more information.

127.   Similarly, the customer brochure for the 2015 Audi A3 advertises safety, stating, "we don't see safety as an option, or a luxury" and citing to the vehicle's various safety features, including electronic stability control, antilock braking system,    airbags, and pop-up roll bars. However, the Defect is not mentioned, neither in the brochures nor the owner's manuals, to which consumers are directed for more information.

128.   VW had numerous opportunities to warn prospective purchasers that the Class Vehicles contained a serious defect that could not only affect the ability of the cars to be driven, but also carried a significant associated safety risk of fuel odor, leaking, and fire. But none of the statements that VW published and distributed about

the vehicles, including brochures, commercials, fact sheets, window stickers, warranty booklets, and owner's manuals contained any mention of the Defect.

129.  VW further touts the Class Vehicles and makes other express representations and warranties about their quality, durability, and performance. However, in truth, VW knew before selling the Class Vehicles that they suffered from the Defect, but never disclosed that knowledge. Had VW disclosed that knowledge, Plaintiffs and Class members would not have purchased their vehicles or would not have purchased them for the same price.

## VI.   Defendants Have Actively Concealed the Defect

130.  Despite their knowledge of the Defect in the Class Vehicles, Defendants actively concealed the existence and nature of the defect from Plaintiffs and Class Members. Specifically, Defendants failed to disclose or actively concealed from Plaintiffs and Class Members, at and after the time of purchase, lease, or repair:

a.     failed to disclose, at the time of purchase or repair and thereafter, any and all known material defects or material nonconformities of the Class Vehicles, including the Suction Pump Defect;

b.     failed to disclose, at the time of purchase or repair and thereafter, that the Class Vehicles were not in good working order, were defective, and were not fit for their intended purpose; and

c.     failed to disclose and/or actively concealed the fact that the Class Vehicles were defective, despite the fact that VW learned of the Suction Pump Defect before it placed the Class Vehicles in the stream of commerce.

131.   Discovery will show that when consumers present their Class Vehicles to an authorized Defendants' dealer for repairs to the fuel tank, suction jet pump, or related components, rather than repair the problem under warranty, Defendants' dealers either inform consumers that their vehicles are functioning properly or conduct repairs that merely mask the Defect.

132.   Defendants have caused Plaintiffs and Class Members to expend money and/or time at their dealerships to diagnose, repair or replace the Class Vehicles' fuel tank, suction jet pump, and/or related components, despite Defendants' knowledge of the Defect.

133.   As a result, Class Members continue to experience the Defect despite having repairs, as shown by the experiences of Plaintiffs. Because many Class Members, like Plaintiffs, are current owners or lessees who rely on their vehicles on a daily basis, compensation for repairs, related expenses (e.g. towing), and diminution in value is not sufficient.

134.   Class Members have not received the value for which they bargained when they purchased or leased the Class Vehicles.

135.   As a result of the Defect, the value of the Class Vehicles has diminished, including without limitation, the resale value of the Class Vehicles.

136.   The existence of the Defect is a material fact that a reasonable consumer would consider when deciding whether to purchase or lease a Class Vehicle. Whether a vehicle's fuel leaks, causing premature fuel nozzle shutoffs, fuel spillbacks, and/or gas odor inside the vehicle, thereby putting consumers, passengers, and bystanders in danger, is a material safety concern. Had Plaintiffs and

other Class Members known of the Defect, they would have paid less for the Class Vehicles or would not have purchased or leased them.

137.   Reasonable consumers, like Plaintiffs, expect that a vehicle is safe, will function in a manner that will not pose a safety risk, is free from defects, and will not malfunction while operating the vehicle as it is intended. Plaintiffs and Class Members further expect and assume that VW will not sell or lease vehicles with known safety defects, such as the Defect, and will fully disclose any such defect to consumers prior to purchase or offer a suitable non-defective repair.

## VII.   The Relationship Between VWGoA and its Network of Authorized Dealerships related to VW's Warranties

138.   In order to sell vehicles to the general public, VWGoA enters into agreements with its nationwide network of authorized dealerships to engage in retail sales with consumers such as Plaintiffs. In return for the exclusive right to sell new, VW-branded vehicles, the authorized dealerships are also permitted under these agreements with VWGoA to service and repair these vehicles under the warranties VWGoA provides directly to consumers who purchased new vehicles from the authorized dealerships. Accordingly, VWGoA's authorized dealerships areVWGoA's agents, and the consumers who purchase or lease VWGoA vehicles are the third-party beneficiaries of these dealership agreements, which allow the consumers to purchase and service their VWGoA vehicles locally. Because Plaintiffs and members of the Class are third-party beneficiaries of the dealership agreements which create the implied warranty, they may avail themselves of the implied warranty. This is true because third-party beneficiaries to contracts between

other parties that create an implied warranty of merchantability may avail themselves of the implied warranty.

139. Further, Plaintiffs and each of the members of the Class are the intended beneficiaries of VWGoA's express and implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles, and they have no rights under the warranty agreements provided by VWGoA. VWGoA's warranties were designed for and intended to benefit the consumers only. The consumers are the true intended beneficiaries of VWGoA's express and implied warranties, and the consumers may therefore avail themselves of those warranties.

140. VWGoA issued the express warranty to the Plaintiffs and the Class members. VWGoA also developed and disseminated the owner's manual and warranty booklets, advertisements, and other promotional materials relating to the Class Vehicles. VWGoA also is responsible for the content of the Monroney Stickers on VW-branded vehicles. Because VWGoA issues the express warranty directly to the consumers, the consumers are in direct privity with VWGoA with respect to the warranties.

141. In promoting, selling, and repairing its defective vehicles, VWGoA acts through numerous authorized dealers who act, and represent themselves to the public, as exclusive VWGoA representatives and agents. That the dealers act as VWGoA's agents is demonstrated by the following facts:

　　　　a. The authorized VW dealerships complete all service and repair according to VWGoA's instructions, which VWGoA issues to its

authorized dealerships through service manuals, technical service bulletins ("TSBs"), and other documents;

b. Technicians at VW dealerships are required to go to at least yearly VWGoA-given trainings in order to remain certified to work on VW-branded vehicles, at which they receive training on VW-proprietary systems such as the ODIS which provides guided, step-by-step instructions on diagnosing and repairing VW-branded vehicles;

c. Consumers are able to receive services under VWGoA's issued New Vehicle Limited Warranty only at VWGoA's authorized dealerships, and they are able to receive these services because of the agreements between VWGoA and the authorized dealers. These agreements provide VWGoA with a significant amount of control over the actions of the authorized dealerships;

d. The warranties provided by VWGoA for the defective vehicles direct consumers to take their vehicles to authorized dealerships for repairs or services;

e. VWGoA dictates the nature and terms of the purchase contracts entered into between its authorized dealers and consumers;

f. VWGoA controls the way in which its authorized dealers can respond to complaints and inquiries concerning defective vehicles, particularly through directed step-by-step ODIS instructions, and the dealerships are able to perform repairs under warranty only with VWGoA's authorization.

g. VWGoA has entered into agreements and understandings with its authorized dealers pursuant to which it authorizes and exercises substantial control over the operations of its dealers and the dealers' interaction with the public, particularly the advertising; and

h. VWGoA implemented its express and implied warranties as they relate to the defects alleged herein by instructing authorized VWGoA dealerships to address complaints of the Defect by prescribing and implementing the relevant TSBs cited herein.

142. Indeed, VWGoA's warranty booklets make it abundantly clear that VWGoA's authorized dealerships are its agents for vehicle sales and service. The booklets, which are plainly written for the consumers, not the dealerships, tell the consumers repeatedly to seek repairs and assistance at their "authorized Volkswagen dealer." For example, the warranty booklets state that the warranty "will be honored by any authorized Volkwagen dealer in the United States, including its territories." Further, the warranty "does not apply to Volkswagen vehicles or parts and accessories not imported or distributed by Volkswagen." Under the terms of the warranty repairs will be provided by a Volkswagen dealer. The booklets direct Plaintiffs and class members, should they have a problem or concern, to first discuss the problem with the service personnel or owner at their authorized Volkswagen dealer and if it is not resolved to contact the Volkswagen Customer Care Center.

143. Further, as noted by VWGoA on its website describing the Audi Certified Pre-Owned program, the vehicles are actually inspected and certified by technicians at authorized dealerships. In touting its "100+ Point Dealer Inspection,"

VWGoA states, that every "Certified Pre-Owned Volkswagen is put through a comprehensive dealer inspection to ensure it meets VW standards." As such, authorized VW dealerships inspect used vehicles on VWGoA's behalf and its dealer's certification of quality of these vehicles is sufficient under standards published by VWGoA that is enough to bind VWGoA to the more

144.    Accordingly, as the above paragraphs demonstrate, the authorized dealerships are agents of VWGoA. Plaintiffs and each of the members of the Class have had sufficient direct dealings with either VWGoA or its agent dealerships to establish privity of contract between VWGoA, on one hand, and Plaintiffs and each of the members of the Class, on the other hand. This establishes privity with respect to the express and implied warranty between Plaintiffs and VWGoA.

## VIII.   Defendants Have Unjustly Retained A Substantial Benefit

145.    Plaintiffs allege that Defendants unlawfully failed to disclose the alleged defect to induce them and other putative Class Members to purchase or lease the Class Vehicles.

146.    Plaintiffs further allege that Defendants thus engaged in deceptive acts or practices pertaining to all transactions involving the Class Vehicles, including Plaintiffs' vehicles.

147. As discussed above therefore, Plaintiffs allege that Defendants unlawfully induced them to purchase Class Vehicles by concealing and/or omitting a material fact (the Defect) and that Plaintiffs would have paid less for the Class Vehicles, or not purchased them at all, had they known of the defect.

148.   Accordingly, Defendants' ill-gotten gains, benefits accrued in the form of increased sales and profits resulting from the material concealment and omissions that deceive consumers should be disgorged.

## IX.   TOLLING OF THE STATUTE OF LIMITATIONS

### A.   Fraudulent Concealment

149.   As previously described, any applicable statute(s) of limitations has been tolled by VW's knowing and active concealment and denial of the facts alleged herein. Plaintiffs and members of the Class could not have reasonably discovered the nature of the Defect prior to this class action litigation being commenced.

150.   VW was and remains under the continuing duty to disclose to Plaintiffs and members of the Class the true character, quality and nature of the Class Vehicles, and it will require costly repairs, poses a safety concern, and diminished the resale value of the Class Vehicles. As a result of the active concealment by VW, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

151.   VW has known of the Defect in the Class Vehicles since at least 2015, and has concealed from, or failed to, notify Plaintiffs, Class members, and the public of the full and complete nature of the Defect, even when directly asked about it by Plaintiffs and Class members during communications with VW, VW Customer Assistance, VW dealerships, and VW service centers.  VW continues to conceal the Defect to this day.

### B.    Estoppel

152.    VW was, and is, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles.  VW actively concealed – and continues to conceal – the true character, quality, and nature of the Class Vehicles and knowingly made representations about the quality and durability of the Vehicles.  Plaintiffs and Class members reasonably relied upon VW's knowing and affirmative representations and/or active concealment of these facts.  Based on the foregoing, VW is estopped from relying on any statutes of limitation in defense of this action.

### C.    Discovery Rule

153.    The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their Class Vehicles suffered from the Defect.

154.    However, Plaintiffs and Class members had no realistic ability to discern that the Class Vehicles were defective until – at the earliest – after the Defect caused Class Vehicles' fuel tank, suction jet pump, and related components to need frequent repair, prematurely fail, require frequent replacement, including replacements just outside of warranty,.

155.    Even then, Plaintiffs and Class members had no reason to know that such failures, or the pre-failure symptoms described above, were caused by a defect in the Class Vehicles because of VW's active concealment of the Defect.  Not only did VW fail to notify Plaintiffs or Class members about the Defect, VW, in fact, denied any knowledge of, or responsibility for, the Defect when directly asked about it.

156. Thus, Plaintiffs and Class members were not reasonably able to discover the Defect until after they had purchased or leased the Class Vehicles, despite their exercise of due diligence, and their causes of action did not accrue until, at earliest, they discovered that the Defect was causing the Class Vehicles' fuel tank, suction jet pump, and related components to need frequent repair, prematurely fail, require frequent replacement, including replacements just outside of warranty.

## CLASS ACTION ALLEGATIONS

157. Plaintiffs bring this lawsuit as a class action on behalf of themselves and all others similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and/or 23(b)(3). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

158. The Class and Sub-Classes are defined as:

> **Class**: All persons or entities who purchased or leased a 2015-2020 Volkswagen Golf, 2015-2020 Audi A3, or 2021-2024 Volkswagen Taos vehicle (Class Vehicle) in the United States (including its territories and the District of Columbia).

> **Connecticut Sub-Class**: All members of the Class who purchased or leased their Class Vehicle in the State of Connecticut.

> **Florida Sub-Class**: All members of the Class who purchased or leased their Class Vehicle in the State of Florida.

> **Hawaii Sub-Class**: All members of the Class who purchased or leased their Class Vehicle in the State of Hawaii.

> **Missouri Sub-Class**:  All members of the Class who purchased or leased their Class Vehicle in the State of Missouri.

> **New Jersey Sub-Class**:  All members of the Class who purchased or leased their Class Vehicle in the State of New Jersey.

159.  Excluded from the Class and Sub-Classes are:  (1) Defendants, any entity or division in which Defendants have a controlling interest, and their legal representatives, officers, directors, assigns, and successors; (2) Defendant's dealers; (3) Class Counsel and their employees; (4) the Judge to whom this case is assigned and the Judge's staff; (5) any Judge sitting in the presiding state and/or federal court system who may hear an appeal of any judgment entered; and (6) those persons who have suffered personal injuries as a result of the facts alleged herein. Plaintiffs reserve the right to amend the Class and Sub-Class definitions if discovery and further investigation reveal that the Class and Sub-Class should be expanded or otherwise modified.

160.  Certification of Plaintiffs' claims for Class-wide treatment is appropriate because Plaintiffs can prove the elements of their claims on a Class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claim.

161.  This action has been brought and may be properly maintained on behalf of each of the Classes proposed herein under Fed. R. Civ. P. 23.

162.  **Numerosity**:  Although the exact number of Class Members is uncertain, and can only be ascertained through appropriate discovery, the number is

significant enough such that joinder is impracticable. The disposition of the claims of these Class Members in a single action will provide substantial benefits to all parties and to the Court. The Class Members are readily identifiable from information and records in Defendants' possession, custody, or control, as well as from records kept by the Department of Motor Vehicles.

163. **Typicality**: Plaintiffs' claims are typical of the claims of the Class in that Plaintiffs, like all Class Members, purchased or leased a Class Vehicle designed, manufactured, and distributed by Defendants. The representative Plaintiffs, like all Class Members, have been damaged by Defendants' misconduct in that they have incurred or will incur the cost of repairing or replacing the defective fuel tank, suction jet pump, and/or related components. Furthermore, the factual bases of Defendants' misconduct are common to all Class Members and represent a common thread resulting in injury to the Class.

164. **Commonality and Predominance**:  There are numerous questions of law and fact common to Plaintiffs and the Class that predominate over any question affecting Class Members individually. These common legal and factual issues include the following:

> a. whether the Class Vehicles suffer from the Suction Pump Defect;
>
> b. whether the Suction Pump Defect constitutes an unreasonable safety hazard;
>
> c. whether Defendants knows about the Suction Pump Defect and, if so, how long Defendants have known of the Defect;

d.  whether the defective nature of the Class Vehicles constitutes a material fact;

e.  whether Defendants had and have a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and the other Class Members;

f.  whether Plaintiffs and the other Class Members are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

g.  whether Defendants knew or reasonably should have known of the Suction Pump Defect contained in the Class Vehicles before they sold or leased them to Class Members; and

h.  Whether Defendants breached the implied warranty of merchantability pursuant to the Magnuson-Moss Warranty Act;

i.  Whether Defendants breached their express warranties under state law and/or the UCC;

j.  Whether Defendants breached written warranties pursuant to the Magnuson-Moss Warranty Act;

k.  Whether Defendants are liable for fraudulent omission; and

l.  Whether Defendants were unjustly enriched.

165.  **Adequate Representation**:   Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs have retained attorneys experienced in the prosecution of class actions, including consumer and product defect class actions, and Plaintiffs intend to vigorously prosecute this action. The

Class's interests will be fairly and adequately protected by Plaintiffs and their counsel.

166. Declaratory Relief.  Rule 23(b)(2) of the Federal Rules of Civil Procedure:  Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and Class members, thereby making appropriate declaratory relief, with respect to each Class as a whole.

167. **Predominance and Superiority**:  Plaintiffs and Class Members have all suffered, and will continue to suffer, harm and damages as a result of Defendants' unlawful and wrongful conduct. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Absent a class action, most Class Members would likely find the cost of litigating their claims prohibitively high and would therefore have no effective remedy. Because of the relatively small size of the individual Class Members' claims, it is likely that only a few Class Members could afford to seek legal redress for Defendants' misconduct. Absent a class action, Class Members will continue to incur damages, and Defendants' misconduct will continue unabated without remedy or relief. Class treatment of common questions of law and fact would also be a superior method to multiple individual actions or piecemeal litigation in that it will conserve the resources of the courts and the litigants and promote consistency and efficiency of adjudication.

**Claims on Behalf of the Connecticut Sub-Class**

**<u>COUNT I</u>**
**BREACH OF EXPRESS WARRANTY**
**Conn. Gen. Stat. Ann. § 42A-2-313**
**(On Behalf of the Connecticut Sub-Class Against VWGoA)**

168.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

169.   Plaintiff Geri Darrow ("Connecticut Plaintiff") brings this count on behalf of herself and the Connecticut Sub-Class against VWGoA.

170.   VWGOA is and was at all relevant times a "merchant" with respect to motor vehicles under Conn. Gen. Stat. Ann. §42a-2-104(1).

171.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Conn. Gen. Stat. Ann. §42a-2-105(1).

172.   The fuel tanks, suction jet pumps, and related components were manufactured and/or installed in the Class Vehicles by VWGoA and are covered by the express warranty.

173.   VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, VWGOA's express warranty is an express warranty under Connecticut state law.

174.   In a section entitled "What is covered," VWGoA's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]his limited warranty covers any repair to correct a defect in manufacturer's material or workmanship (i.e., mechanical defects)..." The warranty further provides that "[r]epairs under this limited warranty are free of charge. Your authorized Volkswagen dealer will repair the defective part or replace it with new or remanufactured genuine Volkswagen part."

175.   According to VWGoA, "The New Vehicle Limited Warranty period is

3 years or 36,000 miles, whichever occurs first" or "4 years or 50,000 miles, whichever occurs first," depending on the model year of the vehicle.

176.   VWGoA's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Connecticut Plaintiff and members of the Connecticut Sub-Class purchased or leased the Class Vehicles with the defective lifter and/or related components.

177.   Connecticut Plaintiff and members of the Connecticut Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, Defendant failed to inform Connecticut Plaintiff and members of the Connecticut Sub-Class that the Class Vehicles were equipped with defective fuel tanks, suction jet pumps, and related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Suction Pump Defect.

178.   VWGOA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by VW and then failing to do so. VW has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

179.   Connecticut Plaintiff and members of the Connecticut Sub-Class have had sufficient direct dealings with either VWGOA or its agents (i.e., dealerships and technical support) to establish privity of contract between VWGOA, on one hand, and Connecticut Plaintiff and each member of the Connecticut Sub-Class on the other hand.  Nonetheless, privity is not required here because Connecticut Plaintiff

and members of the Connecticut Sub-Class are intended third-party beneficiaries of contracts between VWGOA and its distributors and dealers, and specifically, of VWGOA's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

180.   Any attempt by VWGOA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because VWGOA knowingly sold or leased defective products without informing consumers about the Suction Pump Defect.  The time limits are unconscionable and inadequate to protect Connecticut Plaintiff and the members of the Connecticut Sub-Class.  Among other things, Connecticut Plaintiff and members of the Connecticut Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by VWGOA and unreasonably favored VWGOA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Suction Pump Defect existed between VWGOA and members of the Connecticut Sub-Class.

181.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Connecticut Plaintiff and the members of the Connecticut Sub-Class whole, because VWGOA has failed and/or has refused to

adequately provide the promised remedies, *i.e.*, a permanent repair, within a reasonable time.

182.   Connecticut Plaintiff was not required to notify VWGOA of the breach because affording VWGOA a reasonable opportunity to cure its breach of written warranty would have been futile. VWGOA was also on notice of the Suction Pump Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

183.   Nonetheless, Connecticut Plaintiff and members of the Connecticut Sub-Class provided notice to VWGOA of the breach of express warranties when they took their vehicles to VWGOA-authorized provider of warranty repairs. Connecticut Plaintiff also provided notice to VWGOA of its breach of express warranty by letter dated May 30, 2024.

184.   As a result of VWGOA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

185.   As a direct and proximate result of Defendant's breach of express warranties, Connecticut Plaintiff and members of the Connecticut Sub-Class have been damaged in an amount to be determined at trial.

186.   As a result of VWGOA's breach of the express warranty, Connecticut Plaintiff and Connecticut Sub-Class Members are entitled to legal and equitable relief against VWGOA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT II
## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILLITY
## Conn. Gen. Stat. Ann. § 42a-2-314, *et seq*.
### (On Behalf of the Connecticut Sub-Class Against All Defendants)

187.   Plaintiffs repeat and re-allege each and every allegation in the preceding paragraphs of this Complaint as if fully set forth herein.

188.   Connecticut Plaintiff brings this count on behalf of herself and the Connecticut Sub-Class against VW.

189.   VW is and was at all relevant times a "merchant" with respect to motor vehicles under Conn. Gen. Stat. Ann. § 42a-2-104(1).

190.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Conn. Gen. Stat. Ann. §42a-2-105(1).

191.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Conn. Gen. Stat. Ann. § 42a-2-314.

192.   VW knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VW directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom members of the Connecticut Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VW knew that the Class Vehicles would and did pass unchanged from the authorized dealers to members of the Connecticut Sub-Class, with no modification to the defective Class Vehicles.

193.   VW provided Connecticut Plaintiff and members of the Connecticut Sub-Class with an implied warranty that the Class Vehicles and their components

and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, *inter alia*, the Class Vehicles and their fuel tanks, suction jet pumps, and related components suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

194.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by VW were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

195.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. VW knew of this defect at the time these sale or lease transactions occurred.

196.   As a result of VW's breach of the applicable implied warranties, Connecticut Plaintiff and members of the Connecticut Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Suction Pump Defect, Connecticut Plaintiff and members of the Connecticut Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful

life has run.

197.   VW's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

198.   Connecticut Plaintiff and members of the Connecticut Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

199.   Connecticut Plaintiff and members of the Connecticut Sub-Class have had sufficient direct dealings with either VW or its agents (i.e., dealerships and technical support) to establish privity of contract between VW, on one hand, and Connecticut Plaintiff and members of the Connecticut Sub-Class on the other hand. Nonetheless, privity is not required here because Connecticut Plaintiff and members of the Connecticut Sub-Class are intended third-party beneficiaries of contracts between VW and its distributors and dealers, and specifically, of VW's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

200.   Connecticut Plaintiff and members of the Connecticut Sub-Class were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of warranty would have been futile. VW was also on notice of the Suction Pump Defect from the complaints and service requests it

received from Connecticut Plaintiff and the Class Members and through other internal sources.

201.   Nonetheless, Connecticut Plaintiff and members of the Connecticut Sub-Class provided notice to VW of the breach of express warranties when they took their vehicles to VW-authorized provider of warranty repairs.  Connecticut Plaintiff also provided notice to VW of its breach of express warranty by letter dated May 30, 2024.

202.   As a direct and proximate cause of VW's breach, Connecticut Plaintiff and members of the Connecticut Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Connecticut Plaintiff and members of the Connecticut Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

203.   As a direct and proximate result of VW's breach of the implied warranty of merchantability, Connecticut Plaintiff and members of the Connecticut Sub-Class have been damaged in an amount to be proven at trial.

## COUNT III
## VIOLATIONS OF THE CONNECTICUT UNLAWFUL TRADE PRACTICES ACT
### Conn. Gen. Stat. § 42-110A, *et seq*.
### (On Behalf of the Connecticut Sub-Class Against All Defendants)

204.   Plaintiffs repeat and re-allege each and every allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

205.   Connecticut Plaintiff brings this cause of action on behalf of herself and on behalf of the members of the Connecticut Sub-Class.

206.   VW, Connecticut Plaintiff, and Connecticut Sub-Class members are "persons" within the meaning of Conn. Gen. Stat. § 42-110a(3) of the Connecticut Unfair Trade Practices Act ("Connecticut UTPA").

207.   VW engaged in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

208.   The Connecticut UTPA provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a). VW engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Connecticut UTPA.

209.   VW participated in unfair or deceptive trade practices that violated the Connecticut UTPA.  As described below and alleged throughout the Complaint, by failing to disclose the Suction Pump Defect, by concealing the Suction Pump Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Suction Pump Defect in the course of its business.

210.   VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment,

suppression or omission, in connection with the sale of the Class Vehicles.

211.  VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

212.  VW knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

213.  VW knew or should have known that its conduct violated the Connecticut UTPA.

214.  VW was under a duty to Connecticut Plaintiff and the Connecticut Sub-Class Members to disclose the defective nature of the Class Vehicles because:

  a.  VW was in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

  b.  VW made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

  c.  VW actively concealed the defective nature of the Class Vehicles from Connecticut Plaintiff and the Connecticut Sub-Class Members at the time of sale and thereafter.

215.   By failing to disclose the Suction Pump Defect, VW knowingly and intentionally concealed material facts and breached its duty not to do so.

216.  The facts concealed or not disclosed by VW to Connecticut Plaintiff and the Connecticut Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase

or lease VW's Class Vehicles, or to pay less for them. Whether a vehicle's fuel system, fuel tank, and/or suction jet pump is defective, which can cause fuel odor, leaking, and fire, is a material safety concern. Had Connecticut Plaintiff and the Connecticut Sub-Class Members known that the Class Vehicles suffered from the Suction Pump Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

217.    Connecticut Plaintiff and the Connecticut Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Suction Pump Defect. That is the reasonable and objective consumer expectation for vehicles.

218.    As a result of VW's misconduct, Connecticut Plaintiff and the Connecticut Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

219.    As a direct and proximate result of VW's unfair or deceptive acts or practices, Connecticut Plaintiff and the Connecticut Sub-Class Members have suffered and will continue to suffer actual damages.

220.    VW's violations present a continuing risk to Connecticut Plaintiffs and the Connecticut Sub-Class Members as well as to the general public. VW's unlawful acts and practices complained of herein affect the public interest.

221.    Connecticut Plaintiff provided notice of her claims by letter dated May 30, 2024.

222.    Pursuant to Conn. Gen. Stat. § 42-110g, Connecticut Plaintiff and the Connecticut Sub-Class seek an order enjoining VW's unfair and/or deceptive acts or

practices, and awarding damages, punitive damages, attorneys' fees and costs, and any other just and proper relief available under the Connecticut UTPA.

**Claims on Behalf of the Florida Sub-Class**

<u>COUNT IV</u>
**BREACH OF EXPRESS WARRANTY**
**(F.S.A. §§ 672.313 AND 680.21)**
**(On Behalf of the Florida Sub-Class Against VWGoA)**

223.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

224.    Plaintiff Jagger Hardy ("Florida Plaintiff") brings this count on behalf of himself and the Florida Sub-Class against VWGoA.

225.    VWGoA is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

226.    With respect to leases, VWGoA is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

227.    The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

228.    The fuel tank, suction jet pump, and related components installed in the Class Vehicles by Defendants are covered by the express warranty.

229.    VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain.

Accordingly, VWGoA's express warranty is an express warranty under Florida state law.

230.   In a section entitled "What is covered," VWGoA's express warranty (or New Vehicle Limited Warranty ("NVLW")) provides in relevant part that "[t]his limited warranty covers any repair to correct a defect in manufacturer's material or workmanship (i.e., mechanical defects)..." The warranty further provides that "[r]epairs under this limited warranty are free of charge. Your authorized Volkswagen dealer will repair the defective part or replace it with new or remanufactured genuine Volkswagen part."

231.   According to VWGoA, "The New Vehicle Limited Warranty period is 3 years or 36,000 miles, whichever occurs first" or "4 years or 50,000 miles, whichever occurs first," depending on the model year of the vehicle.

232.   VWGoA's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Florida Plaintiff and members of the Florida Sub-Class purchased or leased the Class Vehicles with the defective fuel tank, suction jet pump, and/or related components.

233.   Florida Plaintiff and members of the Florida Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, VWGoA failed to inform Florida Plaintiff and members of the Florida Sub-Class that the Class Vehicles were equipped with defective fuel tank, suction jet pump, and/or related components.  When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Suction Pump Defect.

234.   VWGoA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by Defendants and then failing to do so. VWGoA has not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

235.   Privity is not required here because Florida Plaintiff and members of the Florida Sub-Class are intended third-party beneficiaries of contracts between VWGoA and its distributors and dealers, and specifically, of VWGoA's express warranties, including the NVLW, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

236.   Any attempt by VWGoA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because VWGoA knowingly sold or leased defective products without informing consumers about the Suction Pump Defect. The time limits are unconscionable and inadequate to protect Florida Plaintiff and the members of the Florida Sub-Class.  Among other things, Florida Plaintiff and members of the Florida Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by VWGoA and unreasonably favored VWGoA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety

risk of the Suction Pump Defect existed between VWGoA and members of the Florida Sub-Class.

237.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Florida Plaintiff and the members of the Florida Sub-Class whole, because VWGoA has failed and/or has refused to adequately provide the promised remedies, i.e. a permanent repair, within a reasonable time.

238.   Florida Plaintiff was not required to notify VWGoA of the breach because affording VWGoA a reasonable opportunity to cure its breach of written warranty would have been futile. WVGoA was also on notice of the Suction Pump Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

239.   Nonetheless, Florida Plaintiff and members of the Florida Sub-Class provided notice to VWGoA of the breach of express warranties when they took their vehicles to a VW-authorized provider of warranty repairs.

240.   As a result of WVGoA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

241.   As a direct and proximate result of VWGOA's breach of express warranties, Florida Plaintiff and members of the Florida Sub-Class have been damaged in an amount to be determined at trial.

242.   As a result of VWGoA's breach of the express warranty, Florida Plaintiff and Florida Sub-Class Members are entitled to legal and equitable relief against VWGoA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

**COUNT V**
**BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY**
**(F.S.A. §§ 672.314 AND 680.212)**
**(On behalf of the Florida Sub-Class Against All Defendants)**

243.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

244.   Florida Plaintiff brings this count on behalf of himself and the Florida Sub-Class against Defendants.

245.   VW is and was at all relevant times a "merchant" with respect to motor vehicles under F.S.A. §§ 672.104(1) and 680.1031(3)(k), and a "seller" of motor vehicles under § 672.103(1)(d).

246.   With respect to leases, VW is and was at all relevant times a "lessor" of motor vehicles under F.S.A. § 680.1031(1)(p).

247.   The Class Vehicles are and were at all relevant times "goods" within the meaning of F.S.A. §§ 672.105(1) and 680.1031(1)(h).

248.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under F.S.A. §§ 672.314 and 680.212.

249.   VW knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VW directly sold and marketed Class Vehicles

to customers through authorized dealers, like those from whom Florida Plaintiff and members of the Florida Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VW knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Florida Plaintiff and members of the Florida Sub-Class, with no modification to the defective Class Vehicles.

250.   VW provided Florida Plaintiff and members of the Florida Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their fuel tank, suction jet pump, and/or related components suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

251.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by VW were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

252.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiff and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale

or lease and thereafter as more fully described above. VW knew of this defect at the time these sale or lease transactions occurred.

253.   As a result of VW's breach of the applicable implied warranties, Florida Plaintiff and members of the Florida Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Suction Pump Defect, Florida Plaintiff and members of the Florida Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

254.   VW's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

255.   Florida Plaintiff and members of the Florida Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

256.   Privity is not required here because Florida Plaintiff and members of the Florida Sub-Class are intended third-party beneficiaries of contracts between VW and its distributors and dealers, and specifically, of VW's express warranties, including the NVLW and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

257.   Florida Plaintiff and members of the Florida Sub-Class were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of warranty would have been futile. VW was also on notice of the Suction Pump Defect from the complaints and service requests it received from Florida Plaintiff and the Class Members and through other internal sources.

258.   Nonetheless, Florida Plaintiff and members of the Florida Sub-Class provided notice to VW of the breach of express warranties when they took their vehicles to a VW-authorized provider of warranty repairs.

259.   As a direct and proximate cause of VW's breach, Florida Plaintiff and members of the Florida Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Florida Plaintiff and members of the Florida Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

260.   As a direct and proximate result of VW's breach of the implied warranty of merchantability, Florida Plaintiff and members of the Florida Sub-Class have been damaged in an amount to be proven at trial.

## COUNT VI
## VIOLATIONS OF THE FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT
### (F.S.A. §§ 501.201-.213)
**(On behalf of the Florida Sub-Class Against All Defendants)**

261.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

262.   Florida Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Florida Sub-Class against all Defendants.

263.   VW's business acts and practices alleged herein constitute unfair, unconscionable and/or deceptive methods, acts or practices under the Florida Deceptive and Unfair Trade Practices Act, § 501.201, et seq., Florida Statutes ("FDUTPA").

264.   At all relevant times, Florida Plaintiff and members of the Florida Sub-Class were "consumers" within the meaning of the FDUTPA. F.S.A. § 501.203(7).

265.   VW's conduct, as set forth herein, occurred in the conduct of "trade or commerce" within the meaning of the FDUTPA. F.S.A. § 501.203(8).

266.   FDUPTA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce" at set forth in the statute. Fla. Stat. § 501.204(1).  Breach of express and implied warranties constitutes an unfair or deceptive act or practice under FDUTPA.  VW engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the FDUTPA.

267.   VW participated in unfair or deceptive trade practices that violated the FDUTPA.  As described below and alleged throughout the Complaint, by failing to disclose the Suction Pump Defect, by concealing the Suction Pump Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale

or lease of the Class Vehicles. VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Suction Pump Defect in the course of its business.

268.   VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

269.   VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

270.   VW knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

271.   VW knew or should have known that its conduct violated the FDUTPA.

272.   Defendants were under a duty to Florida Plaintiff and the Florida Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a.   Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

    b.   Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c. Defendants actively concealed the defective nature of the Class Vehicles from Florida Plaintiff and the Florida Sub-Class Members at the time of sale and thereafter.

273.   By failing to disclose the Suction Pump Defect, Defendants knowingly and intentionally concealed material facts and breached their duty not to do so.

274.   The facts concealed or not disclosed by Defendants to Florida Plaintiff and the Florida Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether a vehicle's fuel tank, suction jet pump, and/or related components are defective, which can cause fuel leaks, premature fuel nozzle shutoffs, fuel spillbacks, and/or gas odor, thereby creating the risk of a fire, is a material safety concern. Had Florida Plaintiff and the Florida Sub-Class Members known that the Class Vehicles suffered from the Suction Pump Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

275.   Florida Plaintiff and the Florida Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Suction Pump Defect. That is the reasonable and objective consumer expectation for vehicles.

276.   As a result of Defendants' misconduct, Florida Plaintiff and the Florida Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

277.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Florida Plaintiff and the Florida Sub-Class Members have suffered and will continue to suffer actual damages.

278.   VW's violations present a continuing risk to Florida Plaintiff and the Florida Sub-Class Members as well as to the general public.  VW's unlawful acts and practices complained of herein affect the public interest.

279.   Florida Plaintiff and the Florida Sub-Class Members seek, inter alia, actual damages in an amount to be determined at trial, reasonable attorneys' fees; and any other just and proper relief available under the FDUTPA. Because VW acted with willful and conscious disregard of the rights and safety of others, VW's conduct constitutes malice, oppression, and fraud warranting punitive damages.

**Claims on Behalf of the New Jersey Sub-Class**

<u>COUNT VII</u>
**BREACH OF EXPRESS WARRANTY**
**(N.J. STAT. ANN. §§ 12A:2-313 AND 2A-210)**
**(On behalf of the New Jersey Sub-Class against VWGoA)**

280.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

281.   Plaintiff Luis Viteri ("New Jersey Plaintiff") brings this count on behalf of himself and the New Jersey Sub-Class against VWGoA.

282.   VWGoA is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

283.   With respect to leases, VWGoA is and was at all relevant times a "lessor" of motor vehicles under N.J. Stat. Ann.§ 12A:2A-103(1)(p).

284.   The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann.§§ 12A:2-105(1) and 2A-103(1)(h).

285.   The fuel tank, suction jet pump, and related components were manufactured and/or installed in the Class Vehicles by VWGoA and are covered by the express warranty.

286.   VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, VWGoA's express warranty is an express warranty under New Jersey state law.

287.   VWGoA's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when New Jersey Plaintiff and members of the New Jersey Sub-Class purchased or leased the Class Vehicles with the defective suction jet pump and/or related components.

288.   New Jersey Plaintiff and members of the New Jersey Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, VWGoA failed to inform New Jersey Plaintiff and members of the New Jersey Sub-Class that the Class Vehicles were equipped with defective suction jet pumps and related components.   When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Suction Pump Defect.

289.   VWGoA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by VWGoA and then failing to do so. VWGoA has not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

290.   Privity is not required here because New Jersey Plaintiff and members of the New Jersey Sub-Class are intended third-party beneficiaries of contracts between VWGoA and its distributors and dealers, and specifically, of VWGoA's express warranties, including the NVLW and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

291.   Any attempt by VWGoA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because VWGoA knowingly sold or leased defective products without informing consumers about the Defect.  The time limits are unconscionable and inadequate to protect New Jersey Plaintiff and the members of the New Jersey Sub-Class.  Among other things, New Jersey Plaintiff and members of the New Jersey Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by VWGoA and unreasonable favored VWGoA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety

risk of the Suction Pump Defect existed between VWGoA and members of the New Jersey Sub-Class.

292.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make New Jersey Plaintiff and the members of the New Jersey Sub-Class whole, because VWGoA has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

293.   New Jersey Plaintiff was not required to notify VWGoA of the breach because affording VWGoA a reasonable opportunity to cure its breach of written warranty would have been futile. VWGoA was also on notice of the Suction Pump Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

294.   Nonetheless, New Jersey Plaintiff and members of the New Jersey Sub-Class provided notice to VWGoA of the breach of express warranties when they took their vehicles to VW-authorized providers of warranty repairs.  New Jersey Plaintiff also provided notice to VWGoA of its breach of express warranty by letter dated May 3, 2024.

295.   As a result of VWGoA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

296.    As a direct and proximate result of VWGoA's breach of express warranties, New Jersey Plaintiff and members of the New Jersey Sub-Class have been damaged in an amount to be determined at trial.

297.    As a result of VWGoA's breach of the express warranty, New Jersey Plaintiff and New Jersey Sub-Class Members are entitled to legal and equitable relief against VWGoA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

## COUNT VIII
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
### (N.J. STAT. ANN. §§ 12A:2-314 AND 2A-212)
### (On behalf of the New Jersey Sub-Class Against All Defendants)

298.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

299.    New Jersey Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the New Jersey Sub-Class against all Defendants.

300.    VW is and was at all relevant times a "merchant" with respect to motor vehicles under N.J. Stat. Ann. § 12A:2-104(1) and a "seller" of motor vehicles under § 2-103(1)(d).

301.    With respect to leases, VW is and was at all relevant times a "lessor" of motor vehicles under N.J. Stat. Ann.§ 12A:2A-103(1)(p).

302.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.J. Stat. Ann.§§ 12A:2-105(1) and 2A-103(1)(h).

303.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under N.J. Stat. Ann. §§ 12A:2-314 and 2A-212.

304.   VW knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VW directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom New Jersey Plaintiff and members of the New Jersey Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VW knew that the Class Vehicles would and did pass unchanged from the authorized dealers to New Jersey Plaintiff and members of the New Jersey Sub-Class, with no modification to the defective Class Vehicles.

305.   VW provided New Jersey Plaintiff and members of the New Jersey Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their suction jet pump and/or related components suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

306.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by VW were safe and reliable for providing transportation; and (ii) a warranty that the Class

Vehicles would be fit for their intended use while the Class Vehicles were being operated.

307.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. VW knew of this defect at the time these sale or lease transactions occurred.

308.   As a result of VW's breach of the applicable implied warranties, New Jersey Plaintiff and members of the New Jersey Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Suction Pump Defect, New Jersey Plaintiff and members of the New Jersey Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

309.   VW's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

310.   New Jersey Plaintiff and members of the New Jersey Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

311.   Privity is not required here because New Jersey Plaintiff and members of the New Jersey Sub-Class are intended third-party beneficiaries of contracts between VW and its distributors and dealers, and specifically, of VW's express

warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

312.   New Jersey Plaintiff and members of the New Jersey Sub-Class were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of warranty would have been futile. VW was also on notice of the Defect from the complaints and service requests it received from New Jersey Plaintiff and the Class Members and through other internal sources.

313.   Nonetheless, New Jersey Plaintiff and members of the New Jersey Sub-Class provided notice to VW of the breach of express warranties when they took their vehicles to VW-authorized provider of warranty repairs.  New Jersey Plaintiff also provided notice to VW of its breach of express warranty by letter dated May 3, 2024.

314.   As a direct and proximate cause of VW's breach, New Jersey Plaintiff and members of the New Jersey Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, New Jersey Plaintiff and members of the New Jersey Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

315.   As a direct and proximate result of VW's breach of the implied warranty of merchantability, New Jersey Plaintiff and members of the New Jersey Sub-Class have been damaged in an amount to be proven at trial.

## COUNT IX
### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### (N.J. STAT. ANN. §§ 56:8-1, *ET SEQ.*)
### (On behalf of the New Jersey Sub-Class Against All Defendants)

316.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

317.   New Jersey Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the New Jersey Sub-Class.

318.   VW, New Jersey Plaintiff, and the New Jersey Sub-Class Members are "persons" within the meaning of the New Jersey Consumer Fraud Act ("New Jersey CFA"), N.J. Stat. Ann. § 56:8-1(d).

319.   VW engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

320.   The New Jersey CFA makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentations, or the knowing concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2.  VW engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the New Jersey CFA.

321.    VW participated in unfair or deceptive trade practices that violated the New Jersey CFA.  As described below and alleged throughout the Complaint, by failing to disclose the Defect, by concealing the Suction Pump Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Suction Pump Defect in the course of its business.

322.    VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

323.    VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

324.    VW knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

325.    VW knew or should have known that its conduct violated the New Jersey CFA.

326.   Defendants were under a duty to New Jersey Plaintiff and the New Jersey Sub-Class Members to disclose the defective nature of the Class Vehicles because:

> a.  Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;
>
> b.  Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and
>
> c.  Defendants actively concealed the defective nature of the Class Vehicles from New Jersey Plaintiff and the New Jersey Sub-Class Members at the time of sale and thereafter.

327.   By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached its duty not to do so.

328.   The facts concealed or not disclosed by Defendants to New Jersey Plaintiff and the New Jersey Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether a vehicle's fuel tank, suction jet pump, and/or related components are defective is a material safety concern. Had New Jersey Plaintiff and the New Jersey Sub-Class Members known that the Class Vehicles suffered from the Suction Pump Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

329.   New Jersey Plaintiff and the New Jersey Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

330.   As a result of Defendants' misconduct, New Jersey Plaintiff and the New Jersey Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

331.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, New Jersey Plaintiff and the New Jersey Sub-Class Members have suffered and will continue to suffer actual damages.

332.   VW's violations present a continuing risk to New Jersey Plaintiff and the New Jersey Sub-Class Members as well as to the general public.  VW's unlawful acts and practices complained of herein affect the public interest.

333.   Pursuant to N.J. Stat. Ann. § 56:8-19, New Jersey Plaintiff and the New Jersey Sub- Class Members seek an order enjoining VW's unlawful conduct, actual damages, treble damages, attorneys' fees, costs, and any other just and proper relief available under the New Jersey CFA.

**Claims on Behalf of the Missouri Sub-Class**

<u>COUNT X</u>
**BREACH OF EXPRESS WARRANTY**
**(MO. REV. STAT. § 400.2-313 AND § 400.2A-210)**
**(On behalf of the Missouri Sub-Class against VWGoA)**

334.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

335.   Plaintiff Nancy Pickett ("Missouri Plaintiff") brings this count on behalf of herself and the Missouri Sub-Class against VWGoA.

336.   VWGoA is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Rev. Stat. § 400.2-104(1) and a "seller" of motor vehicles under § 400.2-314.

337.   With respect to leases, VWGoA is and was at all relevant times a "lessor" with respect to motor vehicles under Mo. Rev. Stat. § 400.2A-103(1)(p) and § 400.2A-212.

338.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

339.   The fuel tank, suction jet pump, and related components were manufactured and/or installed in the Class Vehicles by VWGoA and are covered by the express warranty.

340.   VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, VWGoA's express warranty is an express warranty under Missouri state law.

341.   VWGoA's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Missouri Plaintiff and members of the Missouri Sub-Class purchased or leased the Class Vehicles with the defective suction jet pump and/or related components.

342.   Missouri Plaintiff and members of the Missouri Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, VWGoA

failed to inform Missouri Plaintiff and members of the Missouri Sub-Class that the Class Vehicles were equipped with defective suction jet pumps and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Suction Pump Defect.

343.   VWGoA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by VWGoA and then failing to do so. VWGoA has not repaired or adjusted, and has been unable to repair or adjust, the Class Vehicles materials and workmanship defects.

344.   Privity is not required here because Missouri Plaintiff and members of the Missouri Sub-Class are intended third-party beneficiaries of contracts between VWGoA and its distributors and dealers, and specifically, of VWGoA's express warranties, including the NVLW and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

345.   Any attempt by VWGoA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here. Specifically, the warranty limitation is unenforceable because VWGoA knowingly sold or leased defective products without informing consumers about the Suction Pump Defect. The time limits are unconscionable and inadequate to protect Missouri Plaintiff and

the members of the Missouri Sub-Class. Among other things, Missouri Plaintiff and members of the Missouri Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by VWGoA and unreasonably favored VWGoA. A gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between VWGoA and members of the Missouri Sub-Class.

346.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Missouri Plaintiff and the members of the Missouri Sub-Class whole, because VWGoA has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

347.   Missouri Plaintiff and members of the Missouri Sub-Class were not required to notify VWGoA of the breach because affording VWGoA a reasonable opportunity to cure its breach of written warranty would have been futile. VWGoA was also on notice of the Suction Pump Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

348.   Nonetheless, Missouri Plaintiff and members of the Missouri Sub-Class provided notice to VWGoA of the breach of express warranties when they took their vehicles to VWGoA -authorized providers of warranty repairs. Missouri Plaintiff also provided notice to VWGoA of its breach of express warranty by letter dated May 3, 2024.

349.   As a result of VWGoA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

350.   As a direct and proximate result of VWGoA 's breach of express warranties, Missouri Plaintiff and members of the Missouri Sub-Class have been damaged in an amount to be determined at trial.

351.   As a result of VWGoA's breach of the express warranty, Missouri Plaintiff and Missouri Sub-Class Members are entitled to legal and equitable relief against VWGoA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

<u>**COUNT XI**</u>
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(MO. REV. STAT. § 400.2-314 AND § 400.2A-212)**
**(On behalf of the Missouri Sub-Class Against All Defendants)**

352.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

353.   Missouri Plaintiff brings this cause of action on behalf of herself and on behalf of the members of the Missouri Sub-Class.

354.   VW is and was at all relevant times a "merchant" with respect to motor vehicles under Mo. Rev. Stat. § 400.2-104(1) and a "seller" of motor vehicles under § 400.2-314.

355.   With respect to leases, VW is and was at all relevant times a "lessor" with respect to motor vehicles under Mo. Rev. Stat. § 400.2A-103(1)(p) and § 400.2A-212.

356.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Mo. Rev. Stat. § 400.2-105(1) and Mo. Stat. § 400.2A-103(1)(h).

357.   A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Mo. Rev. Stat. § 400.2-314 and § 400.2A-212.

358.   VW knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VW directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Missouri Plaintiff and members of the Missouri Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VW knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Missouri Plaintiff and members of the Missouri Sub-Class, with no modification to the defective Class Vehicles.

359.   VW provided Missouri Plaintiff and members of the Missouri Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold. However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their suction jet pump suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

360.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by VW

were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

361.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. VW knew of this defect at the time these sale or lease transactions occurred.

362.   As a result of VW's breach of the applicable implied warranties, Missouri Plaintiff and members of the Missouri Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Suction Pump Defect, Missouri Plaintiff and members of the Missouri Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

363.   VW's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

364.   Missouri Plaintiff and members of the Missouri Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

365.   Privity is not required here because Missouri Plaintiff and members of the Missouri Sub-Class are intended third-party beneficiaries of contracts between

VW and its distributors and dealers, and specifically, of VW's express warranties, including the NVLW and any warranties provided with certified pre-owned vehicles. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

366.   Missouri Plaintiff and members of the Missouri Sub-Class were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of warranty would have been futile. VW was also on notice of the Defect from the complaints and service requests it received from Missouri Plaintiff and the Class Members and through other internal sources.

367.   Nonetheless, Missouri Plaintiff and members of the Missouri Sub-Class provided notice to VW of the breach of express warranties when they took their vehicles to VW-authorized provider of warranty repairs. Missouri Plaintiff also provided notice to VW of its breach of express warranty by letter dated May 3, 2024.

368.   As a direct and proximate cause of VW's breach, Missouri Plaintiff and members of the Missouri Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Missouri Plaintiff and members of the Missouri Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

369.   As a direct and proximate result of VW's breach of the implied warranty of merchantability, Missouri Plaintiff and members of the Missouri Sub-Class have been damaged in an amount to be proven at trial.

## COUNT XII
### VIOLATION OF THE MISSOURI MERCHANDISING PRACTICES ACT
### (MO. REV. STAT. § 407.010, *ET SEQ.*)
### (On behalf of the Missouri Sub-Class Against All Defendants)

370.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

371.    Missouri Plaintiff brings this cause of action on behalf of herself and on behalf of the members of the Missouri Sub-Class.

372.    VW, Missouri Plaintiff and members of the Missouri Sub-Class are "persons" within the meaning of the Missouri Merchandising Practices Act ("Missouri MPA"), Mo. Rev. Stat. § 407.010(5).

373.    VW engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

374.    The Missouri MPA makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020. VW engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Missouri MPA.

375.    VW participated in unfair or deceptive trade practices that violated the Missouri MPA. As described below and alleged throughout the Complaint, by failing to disclose the Suction Pump Defect, by concealing the Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and

stood behind its vehicles after they were sold, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale or lease of the Class Vehicles. VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Suction Pump Defect in the course of its business.

376. VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale of the Class Vehicles.

377. VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

378. VW knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

379. VW knew or should have known that its conduct violated the Missouri MPA.

380. Defendants were under a duty to Missouri Plaintiff and the Missouri Sub-Class Members to disclose the defective nature of the Class Vehicles because:

    a. Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

b.  Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

c.  Defendants actively concealed the defective nature of the Class Vehicles from Missouri Plaintiff and the Missouri Sub-Class Members at the time of sale and thereafter.

381.  By failing to disclose the Defect, Defendants knowingly and intentionally concealed material facts and breached its duty not to do so.

382.  The facts concealed or not disclosed by Defendants to Missouri Plaintiff and the Missouri Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether a vehicle's fuel tank, suction jet pump, and/or related components are defective is a material safety concern. Had Missouri Plaintiff and the Missouri Sub-Class Members known that the Class Vehicles suffered from the Suction Pump Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

383.  Missouri Plaintiff and the Missouri Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Defect. That is the reasonable and objective consumer expectation for vehicles.

384.  As a result of Defendants' misconduct, Missouri Plaintiff and the Missouri Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

385.   As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Missouri Plaintiff and the Missouri Sub-Class Members have suffered and will continue to suffer actual damages.

386.   VW's violations present a continuing risk to Missouri Plaintiff and the Missouri Sub-Class Members as well as to the general public. VW's unlawful acts and practices complained of herein affect the public interest.

387.   Missouri Plaintiff provided notice of her claims, including a written demand for relief, by letter dated May 3, 2024.

388.   VW is liable to Missouri Plaintiff and Missouri Sub-Class Members for damages in amounts to be proven at trial, including actual damages, attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining VW's unfair and deceptive practices, and any other just and proper relief available under Mo. Rev. Stat. § 407.025.

**Claims on behalf of the Hawaii Sub-Class**
<u>**COUNT XIII**</u>
**BREACH OF EXPRESS WARRANTY**
**(HAWAII REV. STAT. §§ 480-1, ET SEQ.)**
**(On behalf of the Hawaii Sub-Class against VWGoA)**

389.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

390.   Plaintiff Andrew Montemayor ("Hawaii Plaintiff") brings this count on behalf of himself and the Hawaii Sub-Class against VWGoA.

391.   VWGoA is and was at all relevant times a "merchant" with respect to motor vehicles under Haw. Rev. Stat. § 490:2-104(1) and a "seller" of motor vehicles under § 490:2-103(1)(d).

392.   The Class Vehicles are and were at all relevant times "goods" within the meaning of Haw. Rev. Stat. § 490:2-105(1).

393.   The fuel tank, suction jet pump, and related components were manufactured and/or installed in the Class Vehicles by VWGoA and are covered by the express warranty.

394.   VWGoA provided all purchasers and lessees of the Class Vehicles with an express warranty described herein, which became a material part of the bargain. Accordingly, VWGoA's express warranty is an express warranty under Hawaii state law.

395.   VWGoA's NVLW and other warranties regarding the Class Vehicles formed a basis of the bargain that was breached when Hawaii Plaintiff and members of the Hawaii Sub-Class purchased or leased the Class Vehicles with the defective suction jet pump and/or related components.

396.   Hawaii Plaintiff and members of the Hawaii Sub-Class experienced defects within the warranty period. Despite the existence of the NVLW, VWGoA failed to inform Hawaii Plaintiff and members of the Hawaii Sub-Class that the Class Vehicles were equipped with defective suction jet pumps and related components. When providing repairs under the express warranty, these repairs were ineffective and incomplete and did not provide a permanent repair for the Suction Pump Defect.

397.   VWGoA breached the express warranty through the acts and omissions described above, including by promising to repair or adjust defects in materials or workmanship of any part supplied by VWGoA and then failing to do so. VWGoA has not repaired or adjusted, and have been unable to repair or adjust, the Class Vehicles' materials and workmanship defects.

398.   Privity is not required here because Hawaii Plaintiff and members of the Hawaii Sub-Class are intended third-party beneficiaries of contracts between VWGoA and its distributors and dealers, and specifically, of VWGoA's express warranties, including the NVLW and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

399.   Any attempt by VWGoA to disclaim or limit recovery to the terms of the express warranty is unconscionable and unenforceable here.  Specifically, the warranty limitation is unenforceable because VWGoA knowingly sold or leased defective products without informing consumers about the Suction Pump Defect. The time limits are unconscionable and inadequate to protect Hawaii Plaintiff and the members of the Hawaii Sub-Class.  Among other things, Hawaii Plaintiff and members of the Hawaii Sub-Class did not determine these time limitations and/or did not know of other limitations not appearing in the text of the warranties, the terms of which were drafted by VWGoA and unreasonable favored VWGoA. A

gross disparity in bargaining power and knowledge of the extent, severity, and safety risk of the Defect existed between VWGoA and members of the Hawaii Sub-Class.

400.   Further, the limited warranty promising to repair and/or correct a manufacturing or workmanship defect fails of its essential purpose because the contractual remedy is insufficient to make Hawaii Plaintiff and the members of the Hawaii Sub-Class whole, because VWGoA has failed and/or has refused to adequately provide the promised remedies, i.e., a permanent repair, within a reasonable time.

401.   Hawaii Plaintiff was not required to notify VWGoA of the breach because affording VWGoA a reasonable opportunity to cure its breach of written warranty would have been futile. VWGoA was also on notice of the Defect from the complaints and service requests it received from Class Members, including those formal complaints submitted to NHTSA, and through other internal sources.

402.   Nonetheless, Hawaii Plaintiff and members of the Hawaii Sub-Class provided notice to VWGoA of the breach of express warranties when they took their vehicles to VWGoA -authorized providers of warranty repairs. Hawaii Plaintiff also provided notice to VWGoA of its breach of express warranty by letter dated May 3, 2024.

403.   As a result of VWGoA's breach of the applicable express warranties, owners and/or lessees of the Class Vehicles suffered, and continue to suffer, an ascertainable loss of money, property, and/or value of their Class Vehicles.

404.  As a direct and proximate result of VWGoA's breach of express warranties, Hawaii Plaintiff and members of the Hawaii Sub-Class have been damaged in an amount to be determined at trial.

405.  As a result of VWGoA's breach of the express warranty, Hawaii Plaintiff and Hawaii Sub-Class Members are entitled to legal and equitable relief against VWGoA, including actual damages, specific performance, attorney's fees, costs of suit, and other relief as appropriate.

**COUNT XIV**
**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(HAWAII REV. STAT. § 490:2-314)**
**(On behalf of the Hawaii Sub-Class Against All Defendants)**

406.  Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

407.  Hawaii Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Hawaii Sub-Class.

408.  VW is and was at all relevant times a "merchant" with respect to motor vehicles under Haw. Rev. Stat. § 490:2-104(1) and a "seller" of motor vehicles under § 490:2-103(1)(d).

409.  The Class Vehicles are and were at all relevant times "goods" within the meaning of Haw. Rev. Stat.§ 490:2-105(1).

410.  A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law under Haw. Rev. Stat. § 490:2-314.

411.   VW knew or had reason to know of the specific use for which the Class Vehicles were purchased or leased. VW directly sold and marketed Class Vehicles to customers through authorized dealers, like those from whom Hawaii Plaintiff and members of the Hawaii Sub-Class bought or leased their vehicles, for the intended purpose of consumers purchasing the vehicles. VW knew that the Class Vehicles would and did pass unchanged from the authorized dealers to Hawaii Plaintiff and members of the Hawaii Sub-Class, with no modification to the defective Class Vehicles.

412.   VW provided Hawaii Plaintiff and members of the Hawaii Sub-Class with an implied warranty that the Class Vehicles and their components and parts are merchantable and fit for the ordinary purposes for which they were sold.  However, the Class Vehicles are not fit for their ordinary purpose of providing reasonably reliable and safe transportation because, inter alia, the Class Vehicles and their suction jet pump and/or related components suffered from an inherent defect at the time of sale and thereafter and are not fit for their particular purpose of providing safe and reliable transportation.

413.   This implied warranty included, among other things: (i) a warranty that the Class Vehicles that were manufactured, supplied, distributed, and/or sold by VW were safe and reliable for providing transportation; and (ii) a warranty that the Class Vehicles would be fit for their intended use while the Class Vehicles were being operated.

414.   Contrary to the applicable implied warranties, the Class Vehicles at the time of sale and thereafter were not fit for their ordinary and intended purpose of

providing Plaintiffs and Class Members with reliable, durable, and safe transportation. Instead, the Class Vehicles were and are defective at the time of sale or lease and thereafter as more fully described above. VW knew of this defect at the time these sale or lease transactions occurred.

415.   As a result of VW's breach of the applicable implied warranties, Hawaii Plaintiff and members of the Hawaii Sub-Class suffered an ascertainable loss of money, property, and/or value of their Class Vehicles. Additionally, as a result of the Defect, Hawaii Plaintiff and members of the Hawaii Sub-Class were harmed and suffered actual damages in that the Class Vehicles are substantially certain to fail before their expected useful life has run.

416.   VW's actions, as complained of herein, breached the implied warranty that the Class Vehicles were of merchantable quality and fit for such use in violation of the Uniform Commercial Code and relevant state law.

417.   Hawaii Plaintiff and members of the Hawaii Sub-Class have complied with all obligations under the warranty, or otherwise have been excused from performance of said obligations as a result of VW's conduct described herein.

418.   Privity is not required here because Hawaii Plaintiff and members of the Hawaii Sub-Class are intended third-party beneficiaries of contracts between VW and its distributors and dealers, and specifically, of VW's express warranties, including the NVLW, the Powertrain Warranties, and any warranties provided with certified pre-owned vehicles.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have rights under the warranty agreements

provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumer only.

419. Hawaii Plaintiff and members of the Hawaii Sub-Class were not required to notify VW of the breach because affording VW a reasonable opportunity to cure its breach of warranty would have been futile. VW was also on notice of the Suction Pump Defect from the complaints and service requests it received from Hawaii Plaintiff and the Class Members and through other internal sources.

420. Nonetheless, Hawaii Plaintiff and members of the Hawaii Sub-Class provided notice to VW of the breach of express warranties when they took their vehicles to VW-authorized provider of warranty repairs. Hawaii Plaintiff also provided notice to VW of its breach of express warranty by letter dated May 3, 2024.

421. As a direct and proximate cause of VW's breach, Hawaii Plaintiff and members of the Hawaii Sub-Class suffered damages and continue to suffer damages, including economic damages at the point of sale or lease and diminution of value of their Class Vehicles. Additionally, Hawaii Plaintiff and members of the Hawaii Sub-Class have incurred or will incur economic damages at the point of repair in the form of the cost of repair as well as additional losses.

422. As a direct and proximate result of VW's breach of the implied warranty of merchantability, Hawaii Plaintiff and members of the Hawaii Sub-Class have been damaged in an amount to be proven at trial.

**COUNT XV**
**VIOLATION OF THE HAWAII DECEPTIVE TRADE PRACTICES LAW**
**(HAWAII REV. STAT. §§ 480, *ET SEQ.*)**
**(On behalf of the Hawaii Sub-Class Against All Defendants)**

423.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

424.   Hawaii Plaintiff brings this cause of action on behalf of himself and on behalf of the members of the Hawaii Sub-Class.

425.   VW, Hawaii Plaintiff, and the Hawaii Sub-Class Members are "persons" within the meaning of the Hawaii Deceptive Trade Practices Law ("Hawaii DTPL"), Haw. Rev. Stat. § 480-1.

426.   VW engaged in "sales" of "commodities" within the meaning of Haw. Rev. Stat. § 480-1.

427.   The Hawaii DTPL makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Haw. Rev. Stat. § 480-2(a).  VW engaged in unlawful trade practices, and unfair or deceptive acts or practices that violated the Hawaii DTPL.

428.   VW participated in unfair or deceptive trade practices that violated the Hawaii DTPL.  As described below and alleged throughout the Complaint, by failing to disclose the Suction Pump Defect, by concealing the Suction Pump Defect, by marketing its vehicles as safe, reliable, well-engineered, and of high quality, and by presenting itself as a reputable manufacturer that valued safety, performance and reliability, and stood behind its vehicles after they were sold, VW knowingly and intentionally misrepresented and omitted material facts in connection with the sale

117

or lease of the Class Vehicles. VW systematically misrepresented, concealed, suppressed, or omitted material facts relating to the Class Vehicles and the Defect in the course of its business.

429.   VW also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles.

430.   VW's unfair and deceptive acts or practices occurred repeatedly in VW's trade or business, were capable of deceiving a substantial portion of the purchasing public, and imposed a serious safety risk on the public.

431.   VW knew that the Class Vehicles suffered from an inherent defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

432.   VW knew or should have known that its conduct violated the Hawaii DTPL.

433.   Defendants were under a duty to Hawaii Plaintiff and the Hawaii Sub-Class Members to disclose the defective nature of the Class Vehicles because:

      a.  Defendants were in a superior position to know the true state of facts about the safety defect in the Class Vehicles;

      b.  Defendants made partial disclosures about the quality of the Class Vehicles without revealing the defective nature of the Class Vehicles; and

     c.  Defendants actively concealed the defective nature of the Class Vehicles from Hawaii Plaintiff and the Hawaii Sub-Class Members at the time of sale and thereafter.

434.  By failing to disclose the Suction Pump Defect, Defendants knowingly and intentionally concealed material facts and breached its duty not to do so.

435.  The facts concealed or not disclosed by Defendants to Hawaii Plaintiff and the Hawaii Sub-Class Members are material because a reasonable person would have considered them to be important in deciding whether or not to purchase or lease Defendants' Class Vehicles, or to pay less for them. Whether a vehicle's fuel tank, suction jet pump, and/or related components are defective is a material safety concern. Had Hawaii Plaintiff and the Hawaii Sub-Class Members known that the Class Vehicles suffered from the Suction Pump Defect described herein, they would not have purchased or leased the Class Vehicles or would have paid less for them.

436.  Hawaii Plaintiff and the Hawaii Sub-Class Members are reasonable consumers who do not expect that their vehicles will suffer from the Suction Pump Defect. That is the reasonable and objective consumer expectation for vehicles.

437.  As a result of Defendants' misconduct, Hawaii Plaintiff and the Hawaii Sub-Class Members have been harmed and have suffered actual damages in that the Class Vehicles are defective and require repairs or replacement.

438.  As a direct and proximate result of Defendants' unfair or deceptive acts or practices, Hawaii Plaintiff and the Hawaii Sub-Class Members have suffered and will continue to suffer actual damages.

439.   VW's violations present a continuing risk to Hawaii Plaintiff and the Hawaii Sub-Class Members as well as to the general public.  VW's unlawful acts and practices complained of herein affect the public interest.

440.   Hawaii Plaintiff and the Hawaii Sub- Class Members seek an order enjoining VW's unlawful conduct, actual damages, treble damages, attorneys' fees, costs, and any other just and proper relief available under the Hawaii DTPL.

<u>COUNT XVI</u>
**BREACH OF I WARRANTY UNDER THE MAGNUSON-MOSS WARRANTY ACT**
**(15 U.S.C. § 2303, *et seq*.)**
**(On behalf of the Class and/or SubClass, or alternatively on behalf of themselves in their individual capacity Against All Defendants)**

441.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

442.   Plaintiffs bring this count on behalf of themselves and the Class and/or appropriate Sub-Class, or alternatively on behalf of themselves in their individual capacities against VWGoA, VWAG and Audi AG.

443.   The Class Vehicles are a "consumer product" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

444.   Plaintiff and Class Members are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).

445.   Defendants are a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

446.   VWGoA breached the express warranties by selling and leasing Class Vehicles with fuel tank, suction jet pump, and related components that were

defective, requiring repair or replacement within the warranty period, and refusing to honor the express warranty by repairing or replacing, free of charge, fuel tank, suction jet pump, and related components.  VW has failed to "repair" the defects as alleged herein.

447.  VW impliedly warranted that the Class Vehicles were of merchantable quality and fit for use.  This implied warranty included, among other things: (i) a warranty that the Class Vehicles and their fuel tank, suction jet pump, and related components were manufactured, supplied, distributed, and/or sold by VW would provide safe and reliable transportation; and (ii) a warranty that the Class Vehicles and their fuel tank, suction jet pump, and related components would be fit for their intended use while the Class Vehicles were being operated.

448.  Contrary to the applicable implied warranties, the Class Vehicles and their fuel tank, suction jet pump, and related components at the time of sale and thereafter were not fit for their ordinary and intended purpose of providing Plaintiffs and Class Members with reliable, durable, and safe transportation.  Instead, the Class Vehicles are defective, including the Suction Pump Defect.

449.  Defendants' breach of implied warranties have deprived Plaintiffs and Class Members of the benefit of their bargain.

450.  The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum or value of $25,000.  In addition, the amount in controversy meets or exceeds the sum or value of $50,000 (exclusive of interests and costs) computed on the basis of all claims to be determined in this suit.

451.   Defendants have been afforded a reasonable opportunity to cure their breach, including when Plaintiffs and Class Members brought their vehicles in for diagnoses and repair of the Suction Pump Defect and on DATES when notice letter were sent to Defendants informing them of Plaintiffs intent to pursue a class action.

452.   As a direct and proximate cause of Defendants' breach of implied warranties, Plaintiffs and Class Members sustained and incurred damages and other losses in an amount to be determined at trial.  Defendants' conduct damaged Plaintiffs and Class Members, who are entitled to recover actual damages, consequential damages, specific performance, diminution in value, costs, attorneys' fees, and/or other relief as appropriate.

453.   As a result of Defendants' violations of the Magnuson-Moss Warranty Act as alleged herein, Plaintiff and Class Members have incurred damages.

## COUNT XVII
## UNJUST ENRICHMENT
**(On Behalf of the Class, or in the Alternative, on Behalf of All Sub-Classes Against All Defendants)**

454.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

455.   Plaintiffs bring this count on behalf of themselves and the Class.

456.   As a direct and proximate result of Defendants' failure to disclose known defects, Defendants have profited through the sale and lease of the Class Vehicles.  Although these vehicles are purchased and leased through Defendants' agents, the money from the vehicle sales flows directly back to Defendants.

457.   Additionally, as a direct and proximate result of Defendants' failure to disclose known defects in the Class Vehicles, Plaintiffs and Class Members have vehicles that require repeated, high-cost repairs that can and therefore have conferred an unjust substantial benefit upon Defendants.

458.   Defendants have been unjustly enriched due to the known defects in the Class Vehicles through the use money paid that earned interest or otherwise added to Defendants' profits when said money should have remained with Plaintiffs and Class Members.

459.   As a result of the Defendants' unjust enrichment, Plaintiffs and Class Members have suffered damages.

460.   Plaintiffs do not seek restitution under their Unjust Enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Defendants obtained as a result of its unjust conduct.

461.   Additionally, Plaintiffs seek injunctive relief to compel Defendants to offer, under warranty, remediation solutions that Defendants identifies. Plaintiffs also seek injunctive relief enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendants from selling the Class Vehicles with the misleading information; compelling Defendants to provide Class Members with a replacement components that do not contain the defects alleged herein; and/or compelling Defendants to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## COUNT XVIII
## FOR FRAUD BY OMISSION OR FRAUDULENT CONCEALMENT
### (On Behalf of the Class, or in the Alternative, on Behalf of All Sub-Classes Against All Defendants)

462.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

463.   Plaintiffs bring this count on behalf of themselves and the Class, or in the alternative, on behalf of each of the State Sub-Classes.

464.   Defendants knew that the Class Vehicles suffered from an inherent Suction Pump Defect, were defectively designed and/or manufactured, and were not suitable for their intended use.

465.   Defendants concealed from and failed to disclose to Plaintiffs and Class Members the defective nature of the Class Vehicles.

466.   Defendants were under a duty to Plaintiffs and Class Members to disclose the defective nature of the Class Vehicles because:

a.   Defendants were in a superior position to know the true state of facts about the safety defect contained in the Class Vehicles;

b.   The omitted facts were material because they directly impact the safety of the Class Vehicles;

c.   Defendants knew the omitted facts regarding the Defect were not known to or reasonably discoverable by Plaintiffs and Class Members;

d.   Defendants made partial disclosures about the quality of the Class Vehicles without revealing their true defective nature; and,

e.  Defendants actively concealed the defective nature of the Class Vehicles from Plaintiffs and Class Members.

467.  The facts concealed or not disclosed by Defendants to Plaintiffs and the other Class Members are material in that a reasonable person would have considered them to be important in deciding whether to purchase or lease Defendants' Class Vehicles or pay a lesser price for them. Had Plaintiffs and Class Members known about the defective nature of the Class Vehicles, they would not have purchased or leased the Class Vehicles or would have paid less for them.

468.  Defendants concealed or failed to disclose the true nature of the design and/or manufacturing defects contained in the Class Vehicles to induce Plaintiffs and Class Members to act thereon. Plaintiffs and the other Class Members justifiably relied on Defendants' omissions to their detriment. This detriment is evident from Plaintiffs and Class Members' purchase or lease of Defendants' defective Class Vehicles.

469.  Defendants continued to conceal the defective nature of the Class Vehicles even after Class Members began to report the problems. Indeed, Defendants continue to cover up and conceal the true nature of the problem today.

470.  As a direct and proximate result of Defendants' misconduct, Plaintiffs and Class Members have suffered and will continue to suffer actual damages. Plaintiffs and the Class reserve their right to elect either to (a) rescind their purchase or lease of the defective Class Vehicles and obtain restitution or (b) affirm their purchase or lease of the defective Class Vehicles and recover damages.

471.   Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being to enrich Defendants. Defendants' conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT XIX
## UNJUST ENRICHMENT
### (On Behalf of the Class, or in the Alternative, on Behalf of All Sub-Classes Against All Defendants)

472.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

473.   Plaintiffs bring this count on behalf of themselves and the Class or, alternatively, on behalf of all Sub-Classes against Defendants.

474.   Defendants have received and retained a benefit from Plaintiffs and all Class Members and inequity has resulted.

475.   Defendants have benefitted from selling and leasing defective cars whose value was artificially inflated by Defendants' concealment of the Defect, and Plaintiffs and Class Members have overpaid for the cars and have been forced to pay other costs.

476.   As a result of its wrongful acts, concealments, and omissions of the defect in its Class Vehicles, as set forth above, Defendants charged higher prices for their vehicles than the vehicles' true value. Plaintiffs and Class Members paid than higher price for their vehicles to Defendants' authorized distributors and dealers, which are in Defendants' control.

477.   All Class members conferred a benefit on Defendants.

478.   It is inequitable for Defendants to retain these benefits.

479.   Plaintiffs and all Class members were not aware of the true facts about the Class Vehicles and did not benefit from Defendants'conduct.

480.   Defendants knowingly accepted the benefits of its unjust conduct.

481.   As a result of the Defendants' unjust enrichment, Plaintiffs and Class Members have suffered damages.

482.   Plaintiffs do not seek restitution under their Unjust Enrichment claim. Rather, Plaintiffs and Class Members seek non-restitutionary disgorgement of the financial profits that Defendant obtained as a result of its unjust conduct.

483.   Additionally, Plaintiffs seek injunctive relief to compel Defendants to offer, under warranty, remediation solutions that Defendants identify. Plaintiffs also seek injunctive relief enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles, enjoining Defendants from selling the Class Vehicles with the misleading information; compelling Defendants to provide Class members with a replacement components that do not suffer from the defects alleged herein; and/or compelling Defendants to reform its warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed. Money damages are not an adequate remedy for the above requested non-monetary injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court enter judgment against Defendants and

in favor of Plaintiffs, the Class and all Sub-Classes, and award the following relief:

A.   A declaration that any applicable statutes of limitations are tolled due to Defendants' fraudulent concealment and that Defendants are estopped from relying on any statutes of limitations in defense;

B.   A declaration that Defendants are financially responsible for notifying all Class Members of the Suction Pump Defect;

C.   An order enjoining Defendants from further deceptive distribution, sales, and lease practices with respect to Class Vehicles; compelling Defendants to issue a voluntary recall for the Class Vehicles pursuant to 49 U.S.C. § 30118(a); compelling Defendants to repair and eliminate the Suction Pump Defect from every Class Vehicle; enjoining Defendants from selling the Class Vehicles with the misleading information; and/or compelling Defendants to reform their warranty, in a manner deemed to be appropriate by the Court, to cover the injury alleged and to notify all Class Members that such warranty has been reformed;

D.   Damages and restitution in an amount to be proven at trial;

E.   An order certifying the proposed Class and Sub-Classes, designating Plaintiffs named representatives of the Class and Sub-Classes, and designating the undersigned as Class Counsel;

F.   A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

G.   Any and all remedies provided pursuant to the express and implied warranty laws, common law fraud by concealment laws, and consumer protection statutes alleged herein;

H.   An award to Plaintiffs and the Class and Sub-Classes of compensatory, exemplary, and statutory damages as applicable, including interest, in an amount to be proven at trial;

I.    A declaration that Defendants must disgorge, for the benefit of the Class and Sub-Classes, all or part of the ill-gotten profits it received from the sale or lease of Class Vehicles, and/or make full restitution to Plaintiffs and Class Members;

J.    An award of reasonable attorneys' fees and costs, as allowed by law;

K.   An award of pre-judgment and post-judgment interest, as provided by law;

L.    Leave to amend the Complaint to conform to the evidence produced at trial; and

M.   Such other relief as may be appropriate under the circumstances.

## JURY TRIAL DEMANDED

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs demand a trial by jury of any and all issues in this action so triable.

Dated: August 2, 2024                    BERGER MONTAGUE PC

/s/Russell D. Paul
Russell D. Paul (NJ Bar. No. 037411989)

Amey J. Park (NJ Bar. No. 070422014)
Abigail J. Gertner (NJ Bar. No. 019632003)
Natalie Lesser (NJ Bar No. 017882010)
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tel.:   (215) 875-3000
Fax:   (215) 875-4604
rpaul@bm.net
apark@bm.net
agertner@bm.net
nlesser@bm.net

Tarek H. Zohdy (*pro hac vice forthcoming*)
Cody R. Padgett (*pro hac vice forthcoming*)
Laura E. Goolsby (*pro hac vice forthcoming*)
Nathan N. Kiyam (*pro hac vice forthcoming*)
CAPSTONE LAW APC
1875 Century Park East, Suite 1000
Los Angeles, California 90067
Tel.:   (310) 556-4811
Fax:   (310) 943-0396
Tarek.Zohdy@capstonelawyers.com
Cody.Padgett@capstonelawyers.com
Laura.Goolsby@capstonelawyers.com
Nate.Kiyam@capstonelawyers.com

*Attorneys for Plaintiffs and the Proposed*
*Classes*